ATLANTIC PIPE LINE COMPANY

v.

DREDGE PHILADELPHIA, her engines, boilers, tackle, apparel, etc.

and

American Dredging Company, Owner of the Dredge Philadelphia.

The ATLANTIC REFINING COMPANY

v.

DREDGE PHILADELPHIA, her engines, boilers, tackle, apparel, etc.

and

American Dredging Company, Owner of the Dredge Philadelphia.

UNITED STATES of America,

v.

The ATLANTIC REFINING COMPANY, Atlantic Pipe Line Company, Dredge Philadelphia, and American Dredging Company.

Nos. 141, 143, 389 of 1961.

United States District Court
E. D. Pennsylvania.

Nov. 3, 1965.

858

Thomas F. Mount, Rawle & Henderson, Philadelphia, Pa., for Atlantic Pipe Line Co. and Atlantic Refining Co.

Mark D. Alspach, Krusen, Evans & Byrne, Philadelphia, Pa., for American Dredging Co.

Drew J. T. O'Keefe, U. S. Atty., Sullivan Cistone, Asst. U. S. Atty., Philadelphia, Pa., Thomas F. McGovern, Dept. of Justice, Washington, D. C., for the United States.

KIRKPATRICK, District Judge.

These three actions in admiralty, consolidated for trial on the issues of liability, involve five parties—The Atlantic Refining Company, Atlantic Pipe Line Company (its wholly owned subsidiary), the United States, American Dredging Company, owner of the Dredge "Philadelphia", and the Dredge "Philadelphia" in rem. The Pipe Line Company seeks to recover for damage to its pipe line, the Refining Company for loss of its oil, and the United States for damage caused by the escape of oil into its naval basin.

In January 1961, the Refining Company had a great quantity of fuel oil stored in its tank farm—a collection of some 40 or more large storage tanks not far from the junction of the Schuylkill and Delaware Rivers. The Pipe Line Company owned a pair of 30-inch pipe lines, laid down in 1959, running down some several miles from the tank farm pumphouse to a terminal at Fort Mifflin,

on the Delaware at which tankers could discharge their oil cargoes into the pipe lines. At the point where they crossed the Schuylkill River, the pipe lines had been laid in a trench at the bottom of the river.

At about 10:30 on the morning of January 22, an employee of the Navy Department noticed a large quantity of heavy oil on the surface of the Schuylkill River. A great deal of the oil (at first thought by the employee to be coming from a ship going downstream at the time) was driven by a high wind into the United States naval basin, near the mouth of the Schuylkill, where it fouled a number of naval vessels anchored there, causing damage to the ships, compelling the expenditure of a large sum for cleaning the basin and ships and a suspension of work at the basin until it could be cleaned up. The oil, as was discovered later, came from holes which had been punched sometime on January 19 in the southerly (No. 4) pipe line where it crossed the river under the water.[1]

Earlier in the morning of the same day (at about 5:45 A.M.) the Refining Company's employees, having been notified that a ship was at the terminal and would be ready to discharge oil at six o'clock, opened a valve at tank 826, the largest and most elevated of the storage tanks, which allowed oil to run into No. 4 pipe line and thence through the holes in the pipe into the Schuylkill River.

At about 7:11 A.M. the Refining Company's pumpman discovered, by dialing a Varec gauge in the pumphouse, that approximately 19,250 barrels of oil had escaped from the tank since the last time it had been gauged, at 2:40 A.M. The employees at the pumphouse promptly began an investigation to find out what

had become of the missing oil. They did not, however, close the valve which was letting the oil flow out of the tank into the 30-inch pipe line until 9:17 A.M. by which time some 2,000 barrels more[2] had escaped. At 9:45 the valve was again opened, the tanker began to discharge its cargo at 10:10 and pumped oil through the punctured line into the Schuylkill River until 10:45 when the valve was finally closed. This operation accounted for the loss of an additional 6,808 barrels of oil.

On January 19 the Dredge "Philadelphia" was working on the Schuylkill River deepening the channel in pursuance of contracts made by the Dredging Company with the Government and the City of Philadelphia. The dredge, having no motive power, was being advanced by hauling on lines affixed to anchors placed forward in the river beyond the limits of the area to be dredged. A part of the operation of dredging is the alternate raising and lowering of two pointed steel columns, known as spuds, each weighing about 35 tons, placed at the rear end of the dredge. Their function is to hold the vessel in place while the cutterhead at the forward end is in operation. The normal way of lowering a spud is by allowing it to fall free, of its own weight, and become imbedded in the river bottom.

At some time between 6:00 A.M. and 2:00 P.M. on January 19 the dredge lowered one of the spuds by a free fall drop directly over pipe line No. 4, striking it and making the holes from which the oil subsequently escaped. The location of the pipe line was well known to the operators of the dredge and the time when the spuds would be over the pipe line could have been closely approximated. Allowing the spud to fall free

---

1. The escape of the oil had not been noticed before because of the balance of pressures between the oil standing in the pipe and the river which, until disturbed, would result in a very slow transfer which in turn would give only a little streamer of oil visible in a clear river but not visible on the Schuylkill.

2. At 7:11 A.M. the Varec gauge showed oil standing in the tank at a level of 5 ft. 7/8 in. At 9:17 A.M. the Varec gauge showed oil in the tank at 4 ft. 3 7/8 in. A drop in the oil of 1 foot indicates the loss of 3,500 barrels of oil.

860

in the immediate vicinity of the pipe line was a negligent act.

The pipe line was found to have two holes in the top. The hole toward the westerly side of the river was the larger of the two, and there the metal was pressed inward, while directly below it was a third hole—a smaller one with the metal pressed outward. In addition to making a study of a number of photographs of the pipe, I made a personal inspection of the damaged section and witnessed a demonstration with a wooden replica of the pointed end portion of the spud, which was agreed to be correct in form and dimensions. The model was fitted into the holes, and I do not see how anyone who saw the demonstration could fail to be convinced that all three holes were caused by the spud. There can be no question but that the dropping of a 35-ton, pointed steel column would generate enough force to go through the sand and gravel above the pipe line and penetrate both sides of the pipe. A construction inspector for the Corps of Engineers gave his opinion that the damage to the pipe line was caused by an anchor. There was opinion evidence contradicting this theory and, in addition, the captain of the only vessel shown to have been in the neighborhood testified that his ship did not drop an anchor.

■ The testimony of several employees of the Dredging Company, together with that of the government inspector of construction who was aboard the dredge on January 19 part of the time, was that no spud was dropped within the pipe line area (45 feet on each side of the pipe) but that every time a spud was lowered it was "backed down," that is, its descent was controlled by machinery. There was undisputed testimony that the captain of the dredge had given orders to that effect, but he was not on board during the critical hours. If the spud had been backed down, it would not have even dented the pipe. The testimony on this point was not directly contradicted, but the evidence to the contrary, particularly the condition of the punctured pipe as shown by the photographs and the demonstration with the model of the spud point, plus the fact that the dredge admittedly "walked" over the pipe line, all taken in connection with the complete absence of any believable evidence of any other possible cause, is in my judgment unanswerable and compels the conclusion that the damage was produced by the spud.

■ The Dredging Company argues strenuously that the fact that the holes on the top of the pipe were only seven feet nine inches apart, whereas the spuds were sixteen feet apart, makes it an impossibility that they could have produced the punctures. However, the holes need not have been made by more than one spud. A possibility is that the spud was backed down to 40 feet in accordance with instructions and released either through failure of the brake or deliberately. It might then have descended free for the next foot and made the smaller hole in the top of the pipe and, this purchase having been found not sufficient to hold the dredge, it might have been raised and dropped again almost immediately and penetrated through the pipe, the dredge having moved just enough during the interval to account for the spacing between the holes. I do not suggest that there is any evidence that that is what happened. It is cited merely to illustrate that the discrepancy in the distance between the holes and the distance between the spuds does not mean that it was physically impossible for the dredge to have done the damage. It is not intended to say that the captain's orders with regard to lowering the spud were not given. I believe that they were, but they were certainly disregarded either intentionally or negligently.

A great volume of testimony was taken with respect to the painting of rings upon the casing of the spuds in order to give the mate, who directed their raising or lowering and who could see only the top of the spuds from where he was stationed, a means of determining how deep the point of the spud was. There was a sharp conflict as to whether this work was done before or after the accident.

In view of the finding which I have made, the whole matter is immaterial. The marks were useful only if the spuds were backed down and held in position. When a spud was dropped, of course, it was out of control and the marks were useless to prevent damage.

■ The Dredging Company has devoted a considerable amount of its argument to the proposition that the right of a vessel using navigable waters is paramount to that of the owner of submarine structures, which means that in case of accident the burden is on the owner of the structure to show that it was so maintained that it would not be an obstruction to navigation. This principle may be accepted without reservation, but it does not include the right to negligently damage the structure and in this case the dredge could not prudently assume that a dropped spud would not penetrate the material covering a pipe at a depth of 45 feet.

■ A contested issue was whether the pipe line, which was otherwise properly designed and constructed, should have been equipped with devices which would either warn of a break in the line under the river or would automatically close the valves on the river bank upon the occurrence of such a break. Much of the evidence upon the point consisted of widely divergent opinions of experts. It sums up to (1) the fact that submarine sections of pipe lines are very rarely equipped with such devices, (2) expert opinion that they should be more generally used, and (3) expert opinion that, because of the nature of crude oil, particularly when pumped directly into a line from ships, they are likely to be quite undependable or give so many false alarms that they are undesirable. I can only say that I think that neither the Government nor the Dredging Company has proved by the fair weight of the evidence that it was negligent on the part of the Pipe Line Company to omit these devices.

■ At the time when the loss of oil from tank 826 was discovered, the Refining Company did not know, and there was nothing to tell it, that the missing oil was in the river. There was at least a possibility that, through somebody's carelessness, certain valves had been left open and, if that had occurred, the oil would have flowed by gravity into any one of half a dozen tanks. Under these circumstances, I do not think that the Refining Company can be charged with negligence in having failed immediately to set about closing the river valves— an operation which would have taken at least 45 minutes.

■ However, this conclusion does not apply to its failure to promptly close the valve at tank 826. Although that valve had been opened at approximately 5:45 A.M. on January 22, the Refining Company employees did not read the oil level in the tank until 7:11. Had they done so at 5:45, when the tank was opened, and then taken a second reading by the same method within a few minutes, they would have known at once that oil was escaping from the tank. Thereupon, the tank valve could have been closed and the loss stopped. It would have been a very simple thing to do and merely required the pumpman to dial the tank number, whereupon a reading on something similar to a teletype ribbon would appear before him.

The Refining Company was negligent in having failed to follow this procedure which, if followed, would have prevented the loss of all but an insignificant portion of the oil. I agree that the particular accident which caused the loss of oil in this case was one which could hardly have been anticipated but, even so, upon opening a valve capable of emptying a tank holding more than 20,000 barrels of oil, it would have been a reasonable precaution for the Refining Company to see that its plant was functioning properly, and that could have been done by the Varec gauge with minimal expenditure of time and effort.

Even after it had discovered that it had lost a vast amount of oil and in spite of the fact that it knew that the loss was from tank 826, the Refining Company for over two hours took no steps what-

ever to prevent the oil from continuing to run out but busied itself with determining whether or not it had carelessly allowed some other valves in its tank farm to be open. Then, after having stopped the loss of oil by closing the valve at 9:17, it again reopened the line at 9:45, still without knowing where the oil had gone, and permitted the ship to pump oil into the river for a half hour before finally closing it. Why the Refining Company employees did not cut off tank 826 until they could find out whether the oil had escaped from the pipe line or had flowed into another tank is a mystery.

Even if I were to accept the Refining Company's contention (which I do not) that its conduct before 7:11 A.M. cannot be criticized, I could not agree that the further addition of more than 8,000 barrels of oil to that already in the Schuylkill River was such an insubstantial amount that the damage suffered by the Navy was not contributed to by the Refining Company.

■ The Pipe Line Company has not met the burden which maintaining its pipe line at an elevation almost four feet above that allowed by the permit placed upon it—the burden of showing that the violation of its permit, and consequently of the statute,[3] could not have contributed to the accident.

The right of the Pipe Line Company to construct and maintain the pipe line depended entirely upon the permit issued to it by the Army Engineers which was for a pipe line 45 feet below mean low water. Although the line involved in these suits was originally laid at that depth, it was at the time of the accident only slightly more than 41 feet below mean low water. This was in all probability due to the fact that, during the backfilling of the trench, a slurry of sand, silt and water flowed down the sides of the trench and "floated" the pipe up.

In laying down the rule in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148, the Court said that in the case of the violation of a statutory rule intended to prevent collisions, "the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." This rule is not limited to collisions between ships. The Fort Fetterman v. South Carolina State Highway Department, 4 Cir., 268 F.2d 27. In the present case the requirement of the permit of a 45-foot depth was obviously intended to avoid just such hazards as eventuated in these lawsuits. Without entering into a hypothetical discussion, I need only say that I do not think that the Pipe Line Company has proved that the difference in elevation could not have contributed to the accident.

■ The Pipe Line Company is also liable to the Government under the Pennsylvania Pipe Line Statute, 15 P.S. § 2153(g), for damage caused by the escape of oil from the breaks in its pipe line.

The pertinent portion of the Pennsylvania statute referred to above provides, "Any company laying a pipe line within this Commonwealth shall be liable for all damages occasioned by leakage, breaking of pipes or tanks, or any negligence in the construction, maintenance or operation thereof. * * *" The Refining Company denies that the statute makes it liable in this case, for two reasons:

(1) The statute should not be interpreted to impose absolute liability for damages to any and all persons arising from the breaking of a pipe line regardless of how such breaking may have occurred. The argument is that the legislature had in mind a breaking caused by the failure of the pipe itself by reason of defective materials, improper construction, or deterioration and did not contemplate a breaking by an external force or act of a third party unrelated to the operation, maintenance, or construction of the line. The argument, in

---

3. 33 U.S.C. § 403.

effect, is that, if absolute liability was intended, some additional words would have been added. True, this provision is in derogation of the common law and requires a strict construction, but a strict construction would lead only to the conclusion that the statute means exactly what it says, neither more nor less. The operative words "shall be liable" do not restrict or limit the liability imposed, and it would add nothing to their scope if the draftsman had added "absolutely" or "under any and all circumstances" or some similar expression.

When the legislature, in the second clause of the sentence, went on to make pipe line companies liable for damages arising from the "construction, maintenance or operation" of pipe lines, it made that liability depend upon negligence, and it is highly significant that no such restriction of liability had been put in the clause dealing with liability for leakage or breaking of the pipes. It is plain enough that the legislature intended that, if damage is done by the escape of oil from a broken or leaking pipe, there shall be no defense available to the pipe line company, whereas, in other cases [4] the ordinary principles of negligence apply.

(2) The other contention is that the section under consideration is unconstitutional because it is in violation of Article III, Section 3, of the constitution of the state, P.S.—"No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title." The title of the original statute [5] recited that the act authorized, among other things, "the incorporation of pipe lines for the transportation of petroleum, and providing for the exercise of the right of eminent domain in taking lands and property for such purposes." That statute was subsequently amended, first, by the Act of April 30, 1929, P.L. 896, next, by the Act of May 21, 1943, P.L. 550,

and, lastly, by the Act of July 19, 1951, P.L. 1059. The title of the last amendment, so far as pertinent to this discussion, was

> " 'AN ACT To further amend section two of the act, approved the second day of June, one thousand eight hundred and eighty-three (Pamphlet Laws 61), entitled "An act supplementary to an act, entitled 'An act for the incorporation and regulation of corporations,' approved April twenty-ninth, one thousand eight hundred and seventy-four, authorizing the incorporation of pipe lines for the *transportation* of petroleum, and providing for the exercise of the right of eminent domain in taking lands and property for such purposes," \* \* \*.' " (emphasis added)

The most recent pronouncement of the Supreme Court of Pennsylvania upon the then more or less unsettled question of what must appear in the title of an act in order to comply with Article III, Section 3, of the constitution is found in City of Harrisburg v. Pass, 372 Pa. 318, 321, 93 A.2d 447. After referring to a number of earlier decisions of the Court, Chief Justice Stern said,

> "Those cases establish that the title of an act need not be an index of its provisions nor a synopsis of its contents, that it is sufficient if it gives notice of its tenor to interested persons of a reasonably inquiring state of mind, that so long as it indicates a general subject to which the provision involved is germane or incidental the provision itself is sufficiently contained therein,—in short, that the title is not objectionable unless a substantive matter entirely disconnected with the named legislation is included within the folds of the act."

---

4. An example of a case of damage caused by a pipe line other than by breakage or leakage is Clement v. United States Pipe Line Co., 253 Pa. 187, 97 A. 1070.

5. It was an amendment to the General Corporation Act of 1874.

It can hardly be argued that, in a statute the title of which expresses the purpose of authorizing the formation of corporations to engage in the business of transporting oil through pipe lines and conferring upon them the power of eminent domain, a provision imposing liability for damages occasioned by any failure of the corporations' transportation facilities is a matter "entirely disconnected" from the objects named in the title. Certainly it is germane to a statute conferring such a privilege to say to the grantee, "If you transport oil you must securely confine it," and it would seem to follow that it would be germane to say, "If you fail for any reason to securely confine it you shall pay any damage."

■■■ I am aware that courts generally have been reluctant to give an interpretation to a challenged provision of a statute which would accomplish a radical departure from a settled rule of law, Harvey v. Ridley Township, 350 Pa. 210, 38 A.2d 13, but I think that to lay down a rule of absolute liability for the escape of oil from a pipe line is not nearly as radical a departure from the common law as the Refining Company argues. In Hauck v. Tidewater Pipe Line Co., 153 Pa. 366, 26 A. 644, 20 L.R.A. 642, (a case not under the Pipe Line Act) the Court had before it a case in which oil seepage from a pipe line percolated through the adjacent ground and damaged a neighboring property. The Court held that negligence was not a part of the cause of action and applied the rule of liability in nuisance cases which dealt with escape of wild animals and deleterious substances from real property. That liability is almost as broad as the liability imposed by the Pennsylvania Pipe Line Act, and I conclude that the section in question is germane to the purposes set out in the title and that it is not in conflict with the constitution of Pennsylvania.

## Conclusions

1. All three parties, The Atlantic Refining Company, Atlantic Pipe Line Company, and American Dredging Company together with the Dredge "Philadelphia" in rem, are liable to the United States for its loss and damage.

2. Dredge "Philadelphia" and American Dredging Company are liable to Atlantic Pipe Line Company for damage to the pipe line caused by the dropping of the dredge's spud on January 19, 1961.

3. Dredge "Philadelphia" and American Dredging Company are liable to The Atlantic Refining Company for damage occasioned to it by loss of oil caused by dropping of the dredge's spud on January 19, 1961.

The customary interlocutory decree in admiralty may be entered upon notice in accordance with the foregoing opinion.

## Requests

Numerous and helpful requests have been submitted by the parties. A great many of them have to do with the identity of the parties and physical description of the premises and instrumentalities involved. As to these facts there is no dispute and no really useful purpose would be served by extending this opinion to answer them. I have, in my opinion, covered those facts and drawn those conclusions of law which I think necessary for the decision of the matter in the view that I take of it. There are, of course, a number of minor conflicts (as to times, etc.) in the requests, the resolution of which would not affect the result, and some issues are tendered in the requests which I think are immaterial in view of the general finding that the damage to the pipe was caused by the negligent dropping of one of the dredge's spuds. I will, however, affirm the following selected requests which I think may be helpful in the event of an appeal:

Government No. 19. The pipe line was relatively new, having been laid in October 1959 on a contract between Atlantic Pipe Line and Missouri Valley Dredging Co. with American Dredging Company acting as sub-contractor for the trench and supplying the backfill.

The backfill used came out of the river bottom near Cramp's Shipyard and was about 60 to 75% sand. The specifications called for 5 feet of bank run gravel backfill over the top of the pipe and also for a 100 lbs. per square inch air pressure test after the pipe line was laid in a place which was done. Run of the bank gravel is a combination of fine, medium, and coarse gravel from 1–2 millimeters for firm; from ⅜"–1" for medium; and from 1"–3" for coarse. Atlantic Refining construction division, acting as the engineering department of Atlantic Pipe Line, had its inspectors on the job.

Government No. 46. The valves at the river bank crossing were not designed to be used as emergency valves. It took half an hour to close each of these valves, and they were designed to be used to block off the lines when testing for small corrosion leaks by isolating the line and building up oil pressure within the section then determining how long the pressure stayed up.

Refining Co. No. 5. The position of the dredge with reference to the center of the channel to be dredged is reckoned by observing ranges on the shore, forward and aft of the dredge. Her position as related to forward progress is reckoned by observing ranges on the shore placed at intervals of 100 feet, sometimes referred to as "stations." In the nighttime these are observed by using searchlights or the observing lights affixed thereto. The amount of advance is estimated by the leverman observing these station ranges, taking into account the distance forward that the cutterhead may be from the place where such observations are made. The distance from the front of the leverroom to the end of the cutterhead in a horizontal position is approximately 80 feet, and this distance is foreshortened 5 or 6 feet if the cutterhead is dredging from 35 to 40 feet.

Order

Since counsel are of the opinion that the conclusions of law heretofore made may be misconstrued and desire that the Court put them in a more specific form, it is ordered that the conclusions of law are amended as follows:

1. In No. 389 of 1961 in Admiralty, all three parties, The Atlantic Refining Company, Atlantic Pipe Line Company and American Dredging Company, respondent and owner and claimant of Dredge PHILADELPHIA, were at fault and, accordingly, all three are liable to the United States for its loss and damage. The Atlantic Refining Company, Atlantic Pipe Line Company and American Dredging Company must each pay one-third of the loss and damage sustained by the United States.

2. With respect to Atlantic Pipe Line Company's claim for damage to its pipe line asserted in No. 141 of 1961 in Admiralty, both Atlantic Pipe Line Company and American Dredging Company, respondent and owner and claimant of Dredge PHILADELPHIA, were at fault. Accordingly, American Dredging Company must pay to Atlantic Pipe Line Company one-half its damages.

3. With respect to The Atlantic Refining Company's claim for loss of oil asserted in No. 143 of 1961 in Admiralty, The Atlantic Refining Company, Atlantic Pipe Line Company and American Dredging Company, respondent and owner and claimant of Dredge PHILADELPHIA, were all at fault. Accordingly, The Atlantic Refining Company shall recover one-half its damages from American Dredging Company, respondent and owner and claimant of Dredge PHILADELPHIA: and further, American Dredging Company, in its cross-libel asserted against Atlantic Pipe Line Company in No. 141 of 1961 in Admiralty, shall recover from Atlantic Pipe Line Company one-half the sum which it is required to pay to The Atlantic Refining Company.