AMERICAN ZINC CO., Wilbur Ellis Co., Inc., Ralston Purina Corporation, Cargill Incorporated, and International Protein Corporation, Eagle Star Insurance Co., Ltd., Commercial Insurance Company of Newark, Hartford Insurance Company, and Orion Insurance Company, Plaintiffs,

v.

Jacob A. FOSTER, a pilot, and the Ingalls Shipbuilding Division of Litton Systems, Inc., a Maryland Corporation, Defendants,

v.

The INGALLS SHIPBUILDING DIVISION OF LITTON SYSTEMS, INC., a Maryland Corporation, Third Party Plaintiff,

v.

VERA CRUZ CIA. NAVIERA, S.A., Owners of the S/S STELLA MARIS, in personam, and the S/S Stella Maris, her engines, boilers, etc., in rem, and Jacob A. Foster, her pilot, Third Party Defendants.

Civ. A. No. 3758.

United States District Court,
S. D. Mississippi, S. D.
March 20, 1970.

Merle Palmer, Wm. J. Palmer, Pascagoula, Miss., Frank C. Allen, Jr., Robert B. Acomb, Jr., New Orleans, La., for defendant and third party plaintiff (Ingalls).

Albert S. Johnston, III, Pascagoula, Miss., Raymond P. Hayden, Richard Ashworth, New York City, for third party defendants (Vera Cruz & Stella Maris).

John D. Gautier, Pascagoula, Miss., Lester C. Franklin, Jr., Pascagoula, Miss., Francis V. Elias, Donovan, Donovan, Maloof & Walsh, New York City, for plaintiffs (Cargo).

Clinton Lockard, Pascagoula, Miss., for Jacob A. Foster, defendant and third party defendant (Pilot).

NIXON, District Judge.

This is a suit in admiralty filed by plaintiffs, owners of certain shipments of cargo consisting of zinc concentrates, fishmeal and whalemeal, which was loaded and stowed in Peru aboard the Peruvian ship, S/S Stella Maris, and which was being transported thereon to Pascagoula, Mississippi. Plaintiffs contend that their cargo was partly damaged and partly subjected to "Stella Maris'" claim in General Average when the "Stella Maris" struck a submerged object and ultimately sank while traveling up the Pascagoula River on the night of June 5, 1969. This suit was filed by plaintiffs against the defendants, Vera Cruz CIA. Naviera, S.A. (hereinafter referred to as "Vera Cruz"), owners of the S/S Stella Maris, the "Stella Maris" and its agent, Ferrarhos Hermanos Callao, S.A. Plaintiffs subsequently amended their complaint to bring in as defendants Ingalls Shipbuilding Division of Litton Systems, Inc. (hereinafter referred to as "Ingalls") and Jacob A. Foster, a bar pilot on board the vessel "Stella Maris" at the time of the collision (hereinafter referred to as "Foster").

Subsequent to the commencement of this suit, Summary Judgment was granted in favor of the vessel "Stella Maris", its agent and owners because the affidavits and sworn testimony considered on the Summary Judgment hearing convinced this Court that there was no question of fact concerning the seaworthiness of the "Stella Maris", but as a matter of law, she was seaworthy. Thus, plaintiffs were not, as a matter of law, entitled to recover against those defendants under the Carriage of Goods By Sea Act, 46 U.S.C.A. § 1304.

Also, during the time the Motion for Summary Judgment was under consideration, the defendant, Ingalls, filed a Third-Party action against the "Stella Maris", its agent and owners, and Jacob A. Foster, the pilot. Thereafter, Vera Cruz and the agent for the vessel "Stella Maris" filed a counterclaim against Ingalls. At the trial of this matter C. Tennant Sons, & Co. of New York (hereinafter referred to as "Tennant") and the insurers of the subject cargo were added as parties plaintiff with permission of the Court.

All parties to this action jointly moved the Court for a severance of this trial on the issues of liability and damages and pursuant to admiralty practice under 28 U.S.C. § 1292(a) (3) and Rule

53, Federal Rules of Civil Procedure. The Court granted this motion and has tried and will now decide the issue of liability or responsibility only, having reserved the question of damages for further trial in the event the parties cannot stipulate thereto after they have been fully computed and an adjustment of General Average has been completed.

The Court, having heard all the evidence in this case, considered all exhibits, heard arguments of counsel, and carefully read and considered post-trial briefs as well as proposed findings of facts and conclusions of law submitted by all the parties, now makes the following Findings of Fact and arrives at the following Conclusions of Law:

## FINDINGS OF FACT

1. All plaintiffs, other than those who are underwriters, were the owners of the cargo loaded and stowed aboard the "Stella Maris" at the time of the collision in question, including the cargo that was damaged. The Underwriter or Insurer plaintiffs, having reimbursed the titled plaintiffs, their assureds, for the particular losses suffered as a result of the subject casualty were and are subrogated to the latters' rights. The Owner plaintiffs also have standing to complain by virtue of the fact that they have a right of recovery surviving subrogation as to any contribution they may be obligated to make in the General Average declared by the vessel.

2. At the time the cargo was loaded to the "Stella Maris" at the ports of loading in Peru and at the time of the collision in question on June 5, 1969, it was in good order and condition. As a direct result of this collision, the cargo owned by plaintiffs was partially damaged by Pascagoula River water which entered the "Stella Maris" through the tear in her hull caused by striking a submerged object.

3. After being loaded in May, the "Stella Maris" sailed from Paita, Peru, its last port of loading and thereafter arrived off Pascagoula, Mississippi, anchoring at the sea buoy off Petit Bois Island on June 4, 1969. On the following night of June 5, 1969 at approximately 2205 hours "Stella Maris" took aboard the compulsory Pascagoula River pilot and Third Party defendant, Jacob A. Foster, at the sea buoy located south of Horn Island Pass, for the purpose of proceeding north up the Pascagoula River to Terminal "A" wharf located on the Westbank of the Pascagoula River in the Pascagoula harbor to unload her cargo. The vessel weighed anchor and got underway at 2229 hours at full speed ahead. During the voyage up the Pascagoula Channel and into the Pascagoula harbor the "Stella Maris'" first officer, Juan Mejia, who had 22 years of experience at sea and who had sailed into the Pascagoula harbor on four or five previous occasions, was stationed on the forecastle as lookout. Prior to weighing anchor, and after the pilot Foster came aboard, Mr. Mejia consulted and studied Chart No. 414 which is the navigation chart of the Pascagoula Channel and harbor (Ex. I–4) kept aboard the "Stella Maris" as a navigational aid. The vessel was also equipped with a United States Coast Guard Light List, 1969 Volume (Ex. I–3), showing navigational aids in the Pascagoula River, which was consulted by the vessel's captain, Alphonso Oliva Arana, prior to entering the Pascagoula River.

4. Mr. Mejia, the only forward lookout on duty during the voyage from the sea buoy into the Pascagoula harbor, had the duty of keeping a lookout forward for any dangerous or unusual conditions, and for any item that obstructed the vessel's way, and reporting these to the bridge. He received no special instructions from either the captain of the "Stella Maris" or pilot Foster concerning these duties on the night of June 5, 1969, but knew these to be his normal duties as First Officer and lookout. He was stationed on the forecastle, a location approximately 160 feet forward of the bridge. The vessel was equipped with a loudspeaker communication system between the forward lookout's post and the bridge which was in

operating condition on the evening of June 5, 1969 as the vessel entered the Pascagoula River.

5. An anchor watch consisting of the quartermaster, Gosi Collaso, and two other seamen were stationed on the forecastle to drop anchor in the event that it became necessary. Three or four seconds was required to let the anchor go. The "Stella Maris" was equipped with two forward anchors which were in position to be dropped when and if the order was received.

6. The captain of the "Stella Maris", Alphonso Oliva Arana, who had been a ship's master for 15 years although this was his first voyage as captain of the "Stella Maris", was stationed on the bridge of the vessel during the period of time from weighing anchor at the sea buoy until its arrival at Terminal "A" wharf at 0010 hours on June 6, 1969. Also stationed on the bridge of the vessel were her third officer, the helmsman, and pilot Foster. The helmsman of the "Stella Maris" was Juan Garcia Chaves, who had served aboard the vessel for a period of two years and four months and had served as helmsman thereon when it entered the Pascagoula River on six previous occasions.

7. The "Stella Maris" was equipped with a fathometer which was in proper operating condition, radar which had a minimum range of one-half mile and a maximum range exceeding ten miles, and a marine radio equipment, none of which was inquired about by Foster on the night in question and none of which was utilized by anyone aboard the vessel either prior to or subsequent to the collision which occurred.

8. The "Stella Maris" had an overall length of approximately 400 feet and a 50 foot beam. She drew 24 feet of water and eye level on her bridge was 42 feet above the water level.

9. The "Stella Maris", at the direction of its pilot, Foster, passed Beacon No. 46 at a distance between 125 and 150 feet to her starboard side. This beacon is shown on Chart 414 and de-

scribed on the Coast Guard Light List as a flashing red four-second light. At this point the Pascagoula Channel is 350 feet wide and although it is shown on navigation charts to be located 150 feet outside the Channel limit on the east side thereof at its second bend, it is in actuality only approximately 25 feet east of the Channel which has 38 feet of water at that point. As the vessel passed Beacon No. 46 the pilot ordered the helmsman to change course to 000° degrees, or true north, and to reduce speed to "dead slow ahead", or 2½ or 3 knots, which order was carried out. At this time, and at all times on the night in question, including the time of the hereinafter mentioned collision, there was no apparent tide or wind condition present which affected the navigation of the vessel as she proceeded northward. The night was dark but the weather clear and visibility unimpaired.

10. After rounding Beacon No. 46, the pilot Foster attempted to locate the next navigational aid, Buoy R-2 (hereinafter referred to as Buoy 2), privately maintained by the defendant and third party plaintiff Ingalls, which normally displays a red light and has a visibility of a least two miles under the then prevailing weather conditions. Buoy 2 is located approximately 2950 feet north of Beacon No. 46 on the east half of the river and is listed as a private aid to mark the outer submerged end of Ingalls Shipway (launching way) No. One (1) in the U. S. Coast Guard Light List, Vol. 2, Atlantic and Gulf Coast, 1969 Edition. Neither the pilot, the captain, nor the forward lookout was able to see Buoy No. 2 at that time because the light thereon was not burning, and as a matter of fact, it was discovered on June 6, 1969 to have been removed therefrom. Buoy No. 2 is conical shaped, approximately 48 inches in diameter at its topmost point, and was anchored with a 300 pound two-foot square 6-inch thick concrete block on a chain. Neither the pilot Foster nor the captain gave any order for a change of course or speed and the vessel continued ahead from

Beacon No. 46. There was no discussion between the pilot, captain or lookout concerning the fact that the Buoy could not be seen after the vessel passed Beacon No. 46 and before the collision, although Foster stated that he became concerned when he could not locate the lighted Buoy No. 2. The pilot knew that this buoy was listed as privately maintained and knew the purpose thereof. He further testified that he made no distinction between privately maintained aids and Coast Guard maintained aids for navigational purposes, despite the fact that he admitted being familiar with the Coast Guard Light List (Ex. I–3) and the Merchant Marine Officer's Handbook (Ex. I–7) and the Merchant Marine Seaman's Manual (Ex. I–8), all of which state in effect that a prudent pilot should not place complete reliance on privately maintained buoys, and also, that all buoys should be used as guides and not infallible navigational aids.

11. After looking for Buoy No. 2 for approximately three to five minutes while proceeding on a course of true north and after having traversed approximately half the distance between Beacon No. 46 and Buoy No. 2, the pilot observed the Buoy when it was ahead of the vessel and approximately five to ten degrees off the starboard bow. At no time had the pilot or captain looked at the compass since coming to the course of true north, although the quartermaster was navigating and it was his duty to observe the compass. Buoy No. 2 was approximately 150 feet to the starboard side of the vessel at the time the "Stella Maris" passed it abeam. The forward lookout did not observe Buoy No. 2 until the forecastle of the vessel was approximately past it. The captain did not express any concern over the fact that the buoy could not be located, did not question either the lookout or pilot about this situation and gave no orders concerning navigation of the vessel between Beacon No. 46 and Buoy No. 2. No attempts were made by either the pilot or captain to stop the vessel, reverse the engines or anchor the vessel during the time elapsing between passing Beacon No. 46 and the sighting of Buoy No. 2 before the collision. There was no other traffic in the River at the time the "Stella Maris" traveled northward from Beacon No. 46.

12. Within a period of several seconds after Foster sighted the unlighted Buoy No. 2 approximately 150 feet to the starboard beam of the "Stella Maris", the vessel violently collided with some object and the captain asked the pilot if the ship had hit Buoy No. 2 to which the pilot answered in the negative, pointing it out to the captain off the starboard beam. At the time of the collision the pilot thought the vessel was in the middle of the Channel. The collision occurred at 2350 hours (11:50 P.M.) on June 5, 1969 and caused the vessel to sheer to port. At this time the pilot's order to bring the ship back on its proper course was executed, and it proceeded north to Terminal wharf "A". A few minutes after the collision the mate informed the captain that the ship was taking water in the Number 1 and Number 2 cargo holds. "Stella Maris" arrived at Terminal "A" wharf approximately 15 to 20 minutes subsequent to the collision, at which time the crew dropped the starboard anchor and secured the lines to the wharf. The "Stella Maris" is equipped with standard marine radio equipment and the pilot Foster carried a walkie-talkie unit on a special frequency for pilots and F. B. Walker tugboats, but no attempt was made by either the pilot or the captain to summon any type assistance during the time between the collision and the time the vessel docked and her agent was telephoned by the pilot and informed of the collision. The captain had remained on the bridge of the ship from the time of the collision until it docked ten minutes past midnight.

13. Further inspection of the Numbers 1 and 2 cargo holds was made after docking, and it was determined that water was continuing to rise therein. In view of the fact that the vessel's pumps were not controlling the flood-

ing and the water continued to rise in the two holds between decks, at 47 minutes after midnight the "Stella Maris" engines were started and she was beached in the Pascagoula turning basin located approximately 400 yards north of Terminal "A" at approximately 1:00 A.M. on June 6, 1969. She was beached in soft mud where she continued to sink by the bow until the Numbers 1 and 2 cargo holds were entirely flooded and water covered the main deck above those holds, damaging or destroying all cargo stored therein.

14. In addition to the above mentioned navigational aids and equipment, the "Stella Maris" also had aboard two pelorus instruments used for taking bearings, which were stored in the chart room immediately available for use within a matter of seconds, but no attempt was made by either the pilot or the captain to utilize these instruments to take bearings as the vessel traveled from Beacon No. 46 toward Buoy No. 2. There were numerous fixed lights on the east and west banks of the Pascagoula River in the near vicinity of the area of the collision but none of these would have benefited the pilot in navigating the vessel between Beacon No. 46 and Buoy No. 2 on the night in question.

15. The pilot Foster was an experienced Pascagoula bar pilot since 1965 and prior to that time was master and pilot of tugboats operating in the Gulf of Mexico. He possessed a U. S. Coast Guard Master's unlimited license for lakes, bays and sounds, and was a qualified first class pilot for Pascagoula, Mobile and the intercoastal waterway between those two ports. During his ten years as a Pascagoula port pilot Mr. Foster had piloted approximately twelve hundred vessels in and out of the port on an average of approximately 300 per year. He was generally aware of the shipways including Ingalls' Shipway or Launchway No. 1 which was marked by Buoy No. 2. He normally relied solely on this lighted buoy to ascertain his position while navigating vessels into the Pascagoula harbor during nighttime

hours. He and other Pascagoula bar pilots testified that the light on Buoy No. 2 had been inoperational on several occasions prior to June 5, 1969 but that they had never known it to be out of position before that time. He had checked "Stella Maris' " compass on the Horn Island Pass range while passing over the bar and found it to be accurate. On previous occasions Foster had inspected the area around Buoy No. 2 and the end of Shipway No. 1 and had determined that in May 1969, a month before this collision, Buoy No. 2 was located at 15 to 20 feet west of the west end of Way No. 1 and that there was 35 feet of water up to the Buoy. The River Channel was approximately 38 feet deep at high tide at the place where the collision occurred, and at the time of the collision the tide was high, just beginning to fall, with the current moving in a southeasterly direction. The channel of the River was designated to be 350 feet wide but it is actually 370 feet wide in the area of Shipway No. 1. At 8:45 P.M. on the night of this collision, June 5, 1969, Foster had piloted the Victory Class Vessel, S/S Silver Hawk from Terminal "A" wharf in the Pascagoula, Mississippi harbor to Horn Island Pass down the same channel up which the "Stella Maris" was later traveling at the time of the collision. The "Silver Hawk" was approximately 490 feet long with a beam of 65 to 70 feet and a twenty-eight foot draft. Also on May 20, 1969 he traversed this channel while piloting a ship out to the Gulf from Terminal wharf "A" at approximately 4:30 A.M. On neither occasion did he attempt to ascertain the position or condition of Buoy No. 2.

16. At the time of the collision and for a number of years prior thereto the defendant and third party plaintiff, Ingalls, owned and utilized two partially submerged shipways or launchways which extended from the eastbank of the Pascagoula River, Shipway No. 10 and Shipway No. 1, the latter of which is the southernmost. These shipways were constructed and later extended pursuant

to permits issued by the U. S. Army Corps of Engineers, which required that Ingalls maintain such navigational aids in connection therewith as may be required by the U. S. Coast Guard. In accordance with these permits and instructions from the U. S. Coast Guard, Ingalls was to maintain a lighted marker off the outer submerged or western end of each of the ways, which was done, marking the outer submerged extremity of No. 1, the southernmost way, with Buoy No. 2 and the outer offshore submerged extremity of No. 10, the northernmost way with Buoy No. 4, both of which were equipped with lights.

17. On March 14, 1956 Ingalls advised the U. S. Army Corps of Engineers that the length of Shipway No. 1 extended 155 feet out into the Pascagoula River and requested and received authorization to extend the Way 90 additional feet (Exs. C–30, 33), but the extension was never added. Also the Coast Guard granted Ingalls' application to relocate buoys Nos. 2 and 4 so that they continued to mark the outer or offshore submerged extremities or Shipways Nos. 1 and 10, respectively (Exs. 10 to Ex. V–1–A). In March, 1957 Ingalls made a second application to the Corps of Engineers for permission to extend Shipway No. 1 150 feet rather than 90 feet, which was also granted (Ex. C–36) but which was never accomplished. A third application was filed and granted in December, 1958 for authorization to increase the approved March 1957 extension an additional 68 feet, (Exs. C–36, 37 and 38). Ingalls therefore had authorization for a total addition of 218 feet to Shipway No. 1's original length of 155 feet making the authorized length 373 feet from Station 00, the point at which it enters the River, to its outer extremity. Ingalls neither requested nor received any instructions or directions concerning the relocating of Buoys Nos. 2 and 4 in connection with the 1957 and 1958 extension grants but assumed the continuing applicability of the U. S. Coast Guard instructions given in connection with the 1956 permit to relocate

these Buoys to mark the outer or offshore submerged extremity of Shipways Nos. 1 and 10 as reconstructed (Ex. Ven 1–A, pp. 5, 16–19). The permits granted by the U. S. Army Corps of Engineers state that the issuance thereof was made pursuant to the River and Harbors Act of 1899, 33 U.S.C. § 403, which governs the placing of obstructions in navigable waters.

18. Ingalls was aware of the fact that both the U. S. Coast Guard Light List for the Atlantic and Gulf Coast (Ex. I–3) and U. S. Coast Guard Navigation Chart No. 414 (Ex. I–4) reflected the positioning of Buoys Nos. 2 and 4 and the purpose thereof. Ingalls did not request nor receive any instructions or authority from the U. S. Coast Guard to move or relocate Buoys Nos. 2 and 4, but knew that it was its duty to maintain these buoys at stations off the outer submerged western ends of Shipways Nos. 1 and 10 respectively. On and before June 5, 1969 Mariners and Pilots navigating the waters of the Pascagoula River relied on these Buoys to mark the ends of the submerged Shipways (Exs. I–30, p. 84; I–11, pp. 14–15; I–13, p. 15; I–12, p. 11).

19. On the date of the collision and for a long period of time prior thereto, the Ingalls' Maintenance Department, of which Henry Raymond Riley was Manager for over 2½ years at the time of this collision, was responsible for the maintenance of Buoy No. 2, including the lighting thereof (Exs. V–1–A p. 22; V–1–B, pp. 2, 4, 11, 16, 17, 40). However, Ingalls has no record of maintenance performed on Buoy No. 2 or of any inspection thereof during the 2½ year period that Riley was manager of this department dating back to 1967 (Ex. D–1B, pp. 26 and 27; Ex. V–1–A, p. 10). Ingalls' maintenance of Buoy No. 2 has always been limited to replacement of its lights when found not to be working. Riley did state that the positioning of the buoys, including Buoy No. 2, was the responsibility of the Hull Services Department, whose manager is Rudy Schillereff, but no one was apparently aware of this

fact. There was no record of anyone in this department ever having checked the positions of the buoys.

20. On Sunday, June 1, 1969, four days before the collision, Ingalls' maintenance manager, Riley, noticed that the lights on Buoy No. 2 were not burning but did not, between that time and the time of the collision of June 5, 1969, notify anyone, including the Pascagoula Bar Pilots Association or the U. S. Coast Guard, and took no corrective action (Ex. V–1–B). Buoy No. 2 was not lighted on the night of June 5, 1969 immediately before and at the time of the collision. On or about June 7, 1969, Buoy No. 2 was taken ashore by Ingalls' employees and found to be in excellent condition except that the pipe holding the light had been broken off and the light taken, apparently by vandals. Also missing was the power cord which ran underwater from the buoy to Ingalls' onshore facilities where there was an on-off light switch which controlled the light on the buoy (Ex. V–1–B).

21. On June 6, 1969 Buoy No. 2 was not in its proper position, but it was determined by Ingalls and the U. S. Army Corps of Engineers to be 100 to 125 feet east or inshore of the outer or western extremity of Shipway No. 1 (Ex. V–1–A, pp. 7 and 8; Ex. C–48, C–58 and C–59, Item No. 37; Ex. C–46). Buoy No. 2 was in approximately the same position on June 6, 1969 as it was when observed by Riley on June 1, 1969 (Ex. V–1–B, pp. 16–18).

22. Ingalls' No. 1 Shipway was constructed of one long slab of reinforced concrete about 50 feet wide with four rails or groundways, each about six feet wide and precast in 30 foot sections fastened to the top of the slab with large bolts as shown in the sketch attached to the report of L. L. Tait, Professional Diver (Ex. C–51–A). The four groundways are listed as north, north center, south center and south. The ways are on a slight angle with the River resulting in the north groundway extending westwardly about 12–15 feet farther than the south groundway.

23. The submerged object with which the "Stella Maris" collided on June 5, 1969 was the northwest corner of Ingalls' No. 1 Shipway, that is, the north and north center groundways thereof. The reasons for this finding of fact are: (a) The "Stella Maris" was approximately 125 feet to the west of Buoy No. 2 at the time of the collision and Buoy No. 2 which was supposed to be marking the outer or westernmost end of Shipway No. 1 was approximately 125 feet out of position to the east; (b) the nature of the vessel's damage and the area of that damage, that is, just off the west end of the way the depth of the water is 34 feet (Ex. 46; Ex. I–1), and the top of the way at its outward end is only 18 feet below the water surface (Exs. C–46; C–58 and C–59, Item No. 18). The vessel was drawing 24 feet of water (Ex. I–30, p. 56) and the rip or tear in its hull is at approximately the five foot draft mark or 18 to 19 feet below its water line. Considering the high tide prevailing at the time, the location of the hull tear corresponds with considerable exactness to the depth of the damaged area of the way (Alba Testimony; Exs. C–50; C–51–A); (c) the damage suffered by Ingalls' Shipway No. 1, particularly when considered in the light of the angle at its western end, corresponds to a force moving on a northerly course: the damage to the way was of recent origin and the angle irons on the north and north center groundways were bent upstream in a northerly direction indicating that a force moving in that direction had caused the damage (Ex. C–51–A). There was no damage to the south and south center groundways, and the greater damage was on the extreme north groundway (an area of 4 by 6 feet), as compared to that suffered by the north center groundway (an area of 12 inches by 18 inches), (Ex. C–51–A); (d) the absence of any other discovered or known obstruction in this area of the Pascagoula River and the fact that Way No. 1 was undamaged as recently as May 24, 1969 when it was surveyed preparatory to the launch of a U. S. Naval vessel (Exs. V–1–C; C–58

and C–59, Item No. 41). The cradles and launching equipment from the launch of that vessel were of insufficient size and strength to have caused the damage of the severity suffered by the "Stella Maris", and in any event, they had been retrieved in an undamaged condition and moved upriver (Schillereff Deposition); (e) Four rivet heads were found on the groundways by the diver, L. L. Tait, two being embedded in the concrete of the north groundway and two lying thereon. These rivets had antifouling paint on them and the hull of the "Stella Maris" contained the same type rivets (Ex. C–51–A). This indicates a great force of considerable magnitude, such as a moving ship, would have had to strike this way, and examination of the rivet heads (Ex. C–51–B) shows the remaining rivet shafts slanted from their normal right angle to the heads indicating they were subjected to a considerable force; (f) the presence of a piece of concrete found or wedged in the torn area of the "Stella Maris" hull (Nelson Testimony; Ex. V–4). Concrete off the north center groundway of the No. 1 Shipway was found to have been broken, with some pieces lying on the river bottom (Alba Testimony; Ex. C–51–A). The comparison between the concrete found in, and taken from, the vessel's hull, and the concrete retrieved from the way (Ex. V–10), reveals that both bear marks from the same or similar reinforcing rods; (g) in addition, there is no evidence that anything else collided with or damaged Ingalls' Shipway No. 1 at any other time.

24. As discussed above, Ingalls had received authority from the U. S. Corps of Engineers to extend its No. 1 Shipway a total of 373 feet from Station 00, the point at which it enters the river; nevertheless, the U. S. Corps of Engineers Survey made on June 6, 1969, the day after this collision, revealed that the north side groundway of the No. 1 Way from the waterline to the northwest corner which was struck by the "Stella Maris" actually measured 420 feet.

Thus, it exceeded its authorized length by 47 feet (Ex. C–46).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter which is within the Admiralty and Maritime Jurisdiction of the United States and of this Court. 28 U.S.C. § 1331(1).

2. Owner plaintiffs had title to the cargo carried by the "Stella Maris" on the voyage in question and are entitled to bring this action. Although Federal Navigation Regulations do not expressly provide a cause of action for an injured party, as does the FELA, nevertheless such liability is clearly implied. Morania Barge No. 140, Inc. v. M. J. Tracy, Inc. (2nd Cir., 1962), 312 F.2d 78, 80; Lauritzen v. Chesapeake Bay Bridge and Tunnel District, (D.C.Va., 1966) 259 F. Supp. 633, affd. in part and revd. in part, (4th Cir., 1968) 404 F.2d 1001.

3. The insurer plaintiffs were subrogated to the owners' rights upon payment for damages to the owners' cargo aboard the "Stella Maris" pursuant to their policies of insurance. United States v. South Carolina State Highway Dept. (4th Cir., 1948) 171 F.2d 893; Phoenix Insurance Co. v. Erie & W. Transp. Co., 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873 (1886). In addition, plaintiffs other than the underwriters have their right of recovery surviving subrogation as to any contribution they may be obligated to make in the General Average declared by the vessel.

4. Defendant and third party plaintiff, Ingalls, in extending its Shipway No. 1 a total distance of 420 feet in a westerly direction into the Pascagoula River from the East shore thereof at Station 00, exceeded the length of the Way beyond that authorized by the U. S. Army Corps of Engineers Permit (Ex. C–36), and thus violated the River and Harbors Act (33 U.S.C. §§ 401, 403). This violation gives rise to the presumption of negligence per se and results in the creation of an unlawful obstruction to navigable waters. La Crevatte V.

(S.D.Ala., 1968) 1969 A.M.C. 198, 201; Atlantic Pipeline Co. v. Dredge Philadelphia (D.C.Pa., 1965) 247 F.Supp. 857, affd. (3rd Cir. 1966), 366 F.2d 780.

5. The defendant and third party plaintiff, Ingalls, was legally responsible for maintaining Buoy No. 2 to adequately mark its Shipway No. 1 off the outer or western edge thereof and to properly maintain this navigational aid to determine that its lights were functioning and that it was in proper position. It negligently failed to discharge this duty in violation of both the Permit issued by the U. S. Corps of Engineers and the U. S. Coast Guard Regulations. 33 C.F.R. 66.01–15. Ingalls had actual notice through its maintenance department manager, Riley, that the light on the buoy was not burning on June 1, 1969, and knew, or through the exercise of reasonable care, should and would have known through proper inspection and maintenance, that this buoy was out of position on that date as it was on June 5, 1969 at the time of the collision. Since Riley testified that Buoy No. 2 was in approximately the same position on June 6, 1969, the day following the collision, that it was on June 1, 1969, four days before the collision, and in view of the fact that the Buoy was approximately 125 feet east or toward the land from the end of Shipway No. 1 and the "Stella Maris" was approximately 125 feet west or outside said Buoy at the time of the collision, the collision would not have occurred had the unlighted Buoy on June 5, 1969 at the time of the collision been in its proper and designated position. Russell, Poling & Co. v. United States, (2nd Cir. 1950), 252 F.2d 167; Chesapeake & O. Railway Co. v. United States (E.D.Mich., 1962) 1964 A.M.C. 2651.

6. The above deviations by Ingalls constitute statutory violations. The Fort Fetterman v. South Carolina State Hwy. Dept., (4th Cir. 1958) 261 F.2d 563; Lauritzen v. Chesapeake Bay Bridge and Tunnel District, et al, (D.C.

Va., 1966) 259 F.Supp. 633, affd. in part and revd. in part (4th Cir. 1968), 404 F.2d 1001; Atlantic Pipeline Co. v. Dredge Philadelphia, (D.C.Pa., 1965), 247 F.Supp. 857, affd. (3rd Cir. 1966) 366 F.2d 780. These statutory violations constitute negligence per se clearly calling for the application of the rule stated in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873), to the effect that the burden rests upon the party guilty of a statutory fault to show, not only that probably his fault did not contribute to the disaster, but that it could not possibly have done so. The Pennsylvania rule, undoubtedly creates a strong presumption that the above substantial and material statutory faults, singularly or together, were the proximate contributing causes of the collision and places upon the offender the burden of establishing that such violation could not with reasonable possibility have contributed to the collision. The Fort Fetterman v. South Carolina State Hwy. Dept., supra, 261 F.2d at 563, 567, 569. Applying these principles to the facts at hand this Court concludes that Ingalls has not met this required burden, and that its above statutory violations, and each of them, were proximate contributing causes of the collision and the resulting damage to the plaintiffs' cargo and the vessel "Stella Maris".

7. The Court further finds from a preponderance of the evidence that: the defendant Ingalls, having established Buoy No. 2 as an aid to navigation marking the submerged Shipways, as acknowledged by it and as required by the United States Coast Guard and U. S. Corps of Engineers, had the duty to use reasonable care concerning the maintenance of its position, Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), and that it had actual notice through its maintenance manager Riley that the buoy was out of its proper position to such an extent as to endanger navigation. In view of the above findings of facts, Ingalls is held to have constructive knowledge of the movement of the buoy which

could and would have been discovered through a reasonable and proper inspection or through the reporting thereof, in view of the fact that the light thereon was observed to be out on June 1, 1969. It failed to discharge these duties and its failure constituted negligence which proximately caused the collision in question, even in the absence of the applicability of the *Pennsylvania* rule to the facts of this case. See M/S Bella Dan, 1967 A.M.C. 2295, 2304 (E.D.Va., 1967), affd. in part and revd. in part; Chesapeake Bay Bridge and Tunnel District v. Lauritzen (C.A.4, 1968), 404 F.2d 1001; Indian Towing Co. v. United States, *supra;* Casement v. Brown, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582; F. S. Royster Guano Co. v. Outten, (4th Cir., 1920), 266 F. 484; La Crevatte V., *supra.*

8. The pilot Foster was guilty of no negligence which proximately caused or proximately contributed to cause the collision between the "Stella Maris" and Ingalls submerged Shipway No. 1. The duty of the pilot is to exercise that degree of care and skill possessed by the average pilot, and the mere fact that a different course of action might have avoided a collision is not enough in itself to condemn him to legal liability. The pilot's decision to handle the movement as he did was that of a reasonably competent harbor pilot under the circumstances that existed. He exercised the due care and skill required of him and was not required to be infallible. United Fruit Co. v. Mobile Towing & Wrecking Co., (S.D.Ala.1959) 177 F. Supp. 297. Furthermore, a navigator is not charged with negligence unless he makes a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown. The W. H. Baldwin (2nd Cir. 1921) 271 F. 411; Dalldorf v. Higgerson-Buchanan, Inc., (4th Cir. 1968) 402 F.2d 419. The attention which a navigator must pay to his surroundings is not a legal absolute and will vary with the circumstances and situations. Dalldorf v. Higgerson-Bu-

chanan, Inc., *supra.* Aids to navigation placed along a channel for the purpose of navigating a vessel therein, including buoys, are the most immediate sources of information available to those navigating in a narrow channel. Russell, Poling & Co. v. United States, *supra.* Ingalls No. 2 Buoy was the only navigational aid in the Pascagoula River at the place of the collision, and the pilot under the circumstances at night could not through the exercise of reasonable care as a reasonably prudent pilot determine that this buoy was out of position. Therefore, he was entitled to rely upon it being in its proper and designated position, and not offstation. Trinidad Corporation v. S.S. Sister Katingo, 1967 A.M.C. 1561, 1567–1568 (S.D.N.Y., 1967), partially reported 280 F.Supp. 976. Thus, although the general rule is that it is improper for a pilot to rely solely and exclusively upon a buoy when other sources of information are available, this general rule is not applicable to this case since the Court finds that there were no other sources of information available or other navigational aids upon which the pilot could rely to readily and accurately estimate the ship's position in the channel. Russell, Poling & Co. v. United States, *supra.* Because of the low silhouette of the bank on each side, it was impossible to utilize the east and west banks of the river for navigational purposes. However, the pilot did also rely upon a proper compass course and proceeded northward with caution after leaving Beacon No. 46 and after having checked the ship's compass north of Horn Island and found it to be working properly. See Doherty v. Thames Towboat Co., 1920 A.M.C. 215–216 (1919).

9. The pilot was entitled to assume that the navigable waters west of the outer end of the submerged Shipway No. 1 were free from artificial obstructions. See Casement v. Brown, *supra;* M/S Bella Dan, *supra.* The misleading, erroneous and improper position of Ingalls Buoy No. 2, which the pilot passed at what was the normal and proper relative position between the ship he

was piloting and the buoy, that is, approximately 125 feet to the outside or west thereof where there would normally have been at least 34 feet of water and which would have been more than 125 feet west of the outer end, of the submerged Shipway No. 1 had the buoy been in its proper position, leads the Court to conclude that the misleading and erroneous position of this buoy lured the pilot into a dangerous position or trap, and that this was the proximate cause of the collision and of the damages suffered by the cargo plaintiffs and the defendants, vessel and her owner. La Crevatte V. (Steiner v. La Crevatte V, Inc.,) *supra*; Russell, Poling & Co., Inc. v. United States, *supra*.

10. Even assuming negligence on the part of the pilot in proceeding in a northerly direction toward Buoy No. 2 when he could not see the light on that buoy, nevertheless the fact that he did see the buoy and properly passed approximately 125 feet west of it was not a proximate contributing cause of the collision and the resulting damages, because if the buoy had been lighted he would have followed the same course that he did in passing it.

11. The Court further concludes that the utilization of all other navigational aids including radar, fathometer, etc. on board the "Stella Maris" would not have avoided the collision in question. Under the existing circumstances neither the pilot, the captain nor the crew was obligated to use these aids, but in any event, if they had done so, it would not have avoided the collision. Therefore, this nonuse was not a proximate contributing cause of this collision.

12. Furthermore, the Court finds that the pilot had ordered a true north course from Beacon No. 46 which should have brought him to the west side of the submerged Shipway No. 1, but through the natural "crabbing" or "yawing" of the ship to the starboard because the tide was falling to the southeast, the "Stella Maris" proceeded along her ill

fated course. In any event, the pilot was navigating in accordance with and relying upon Buoy No. 2 which he had a right to do, and he would have followed his same course or one even more to the east and closer to the buoy if it had been lit and properly operating. Therefore, the Court finds that this "crabbing" or "yawing" of the ship was not due to the negligence of the pilot or the captain, but even if it was, that this negligence was not a proximate contributing cause of the collision.

13. Neither the vessel "Stella Maris", its owner nor crew was guilty of any fault or negligence which proximately contributed to cause this collision. The "Stella Maris" had a lookout properly stationed, and he was not negligent in failing to see and detect an underwater obstruction such as Ingalls' Shipway No. 1. See M/S Bella Dan, 1967 A.M.C. 2295, 2304 (1967). The captain of the "Stella Maris" exercised due care in permitting the pilot to navigate the ship up the Pascagoula River under the circumstances then and there existing and in placing reliance upon the proper stationing of the buoy, which the "Stella Maris" passed at an apparently safe distance. All of the above conclusions of law arrived at by the Court in absolving the pilot of any negligence which proximately contributed to the collision equally apply to the captain and crew members of the "Stella Maris". The improper positioning of Buoy No. 2 and the complete absence of any inspection program or actual inspections over a period of several years prior to this collision to ascertain the proper positioning of the buoy was one of the proximate causes of this collision in view of the fact that the Court has concluded that the improper positioning of Buoy No. 2 and the unauthorized extension of Shipway No. 1 in excess of its authorized length or extension out into the Pascagoula River were the sole proximate causes of the collision.

14. The Court further finds that the above collision was the sole proximate cause of the damage to

both the ship and the cargo. It is well established that the Courts will not second-guess the decisions made by masters of imperiled vessels even if they are subsequently proved wrong. Federal Insurance Co. v. SS Royalton, (6th Cir., 1964) 328 F.2d 515; Esso Standard Oil, S.A., v. S.S. Gasbras Sul, (2nd Cir., 1967) 387 F.2d 573; Kelley Island Lime & Transport Co. v. City of Cleveland, 47 F.Supp. 533 (E.D.Ohio, 1942). In the Gasbras Sul case the Second Circuit held that the master of a vessel caught in an emergency where he is forced to choose between risky alternatives is entitled to a wide range of discretion in deciding what to do, provided it is a reasonable exercise of current standards of nautical knowledge and skill under the circumstances. It does not become negligence because the decision he makes may later, in the light of subsequent events revealed through hindsight, be shown to have been wrong. The Court finds that the decision of the captain to navigate the vessel to Terminal wharf "A" to attempt to pump her out and her subsequent beaching within the time intervening between the collision, did not constitute negligence, but constituted reasonable and prudent action under the circumstances. Therefore, there was no intervening negligence subsequent to the collision on the part of the captain or anyone else that contributed to damage to the vessel or the cargo therein. The Algonquin (2nd Cir. 1934) 70 F.2d 335; The Walter A. Luckenbach (Lyman Stewart) (9th Cir., 1926) 14 F.2d 100.

15. In conclusion, this Court finds that neither the defendant pilot, Foster, nor the vessel "Stella Maris", its owner, crew or agent was guilty of any negligence which proximately contributed to cause the collision in question, but that the collision which occurred when the "Stella Maris" struck the northbound way of the defendant and third party plaintiff, Ingalls' submerged Shipway No. 1 was solely and proximately caused by the aforesaid negligence of Ingalls. Thus the defendant Ingalls is liable to and must reimburse the appropriate plaintiffs for all losses sustained by them as a result of the collision in question and is liable to and must reimburse them for any contributions they may be called upon to make in General Average and/or salvage, together with all costs of this proceeding. Aktieselskabet Cuzco v. Sucarseco, et al, 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942 (1935). Ingalls is also liable to "Stella Maris" and her owners on their Counterclaim, and must reimburse the vessel and her owners for all their probable damages and losses directly resulting from this collision, together with all costs of this proceeding.

Ingalls is not entitled to recover under its third party Claim which shall be dismissed at its costs.

A Judgment or Decree shall be presented to this Court in accordance with the foregoing Findings and Conclusions within the time prescribed by the Rules.