456 F.2d 476
 Ralph O. GARNER, Maggie Cartwright, etc., Plaintiffs,
v.
CITIES SERVICE TANKERS CORPORATION, Defendant-Third Party
Plaintiff-Appellant,
v.
ALABAMA DRY DOCK AND SHIPBUILDING COMPANY, Inc., Third Party
Defendant-Appellee.
 No. 71-1745.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 28, 1972.
 
 Harry H. Riddick, Hamilton, Butler, Riddick & Latour, Mobile, Ala., for appellant.
 Alex T. Howard, Jr., Mobile, Ala., for appellee; Johnstone, Adams, May, Howard & Hill, Mobile, Ala., of counsel.
 Before TUTTLE, GEWIN and DYER, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 Cities Service Tankers Corp. (Cities Service), owner of the SS BRADFORD ISLAND, appeals from a judgment holding that it is not entitled to indemnity from the Alabama Dry Dock & Shipbuilding Company (shipyard) for settlements made in connection with an accident aboard the vessel. An explosion of a hot water heater aboard the SS BRADFORD ISLAND on October 19, 1966, killed one shipyard employee, Cartwright, and injured two others, Garner and Tolbert. Actions were instituted against Cities Service by Cartwright's widow in the United States District Court and by Garner and Tolbert in the Alabama state courts. Cities Service removed the Garner suit to the United States District Court, filed third party claims against the shipyard seeking indemnity and then settled with the original plaintiffs. Cities Service then amended the third-party complaint in the Garner suit to include its indemnity claim arising from the Tolbert settlement, and the two federal suits, embracing all three indemnity claims, were consolidated for trial. The court held that Cities Service had established: (1) its potential liability to the original workmen plaintiffs; and (2) the reasonableness of the settlements. However the court concluded that Cities Service had failed to prove: (1) that the shipyard's conduct amounted to a breach of the warranty of workmanlike performance (WWLP) which was the proximate cause of the accident; or (2) that the vessel was not guilty of conduct sufficient to preclude indemnity. Based on these findings the district court denied indemnity against the shipyard. We affirm.
 
 
 2
 The SS BRADFORD ISLAND arrived at the Alabama Dry Dock and Shipbuilding Company near Mobile, Alabama, on September 12, 1966, to undergo annual repairs. Upon the ship's arrival at the shipyard the vessel's own steam system was shut down and the shipyard connected shore steam, fresh water and electricity to the vessel. The steam was furnished to the vessel's accommodation steam system, which furnished hot water and heat to the officers' quarters in the midship housing.
 
 
 3
 For slightly over a month repair work proceeded on the vessel while she was both on and off dry dock. On October 19, 1966, the vessel was removed from dry dock where she had been for 9 days and towed to the shipyard's pier A where she was moored in the water. The water and electricity were reconnected just after the ship was moved to pier A at about 4:00 p. m. The shore steam was reconnected about 5:00 p. m. The weather had been cool for a day or two and the shipyard's employees customarily ate their meals in the midship shelter area and warmed themselves by use of the hot water heater located there.
 
 
 4
 At approximately 6:25 p. m. the hot water tank in the midship shelter ruptured. The water in the tank immediately flashed into steam with explosive force, thereby propelling all but the head of the water tank with such force as to cause the death of Cartwright and personal injuries to Garner and Tolbert, who were standing close by at the time.
 
 
 5
 There is no dispute about what caused the explosion following the initial rupture of the tank. At the time of the rupture the water in the tank had been heated to a temperature in excess of 212~ Fahrenheit (F), the boiling point of water at atmospheric pressure. When the rupture occurred the superheated water was exposed to the atmosphere and instantly flashed into steam with a volume some 1600 times greater than the volume of the water before the rupture. This expansion of the steam created the explosive force which resulted in the injuries to the original plaintiffs.
 
 
 6
 The dispute in this suit centers on the question of what caused the initial rupture of the hot water tank. The water in the tank was heated by coils of tubing through which passed pressurized steam. When the explosion occurred, the outer shell of the tank ruptured at one end and then was blown clear of the steam coils. The steam coils did not rupture and no steam entered the tank from the coils.
 
 
 7
 The court decided that the shipyard had connected saturated steam at a pressure of 125 pounds per square inch (PSI) to the ship's system which was rated at 70 PSI. The shore-based steam entered the ship's system and then passed through a fine mesh strainer and through a reducing valve which was designed to reduce up to 250 PSI of steam down to 10 PSI. However, the court determined that on the occasion of the accident the reducing valve was defective and failed to operate and to reduce the 125 PSI steam pressure.
 
 
 8
 Just downstream of the reducing valve in the steam line there was located a pressure relief valve which was set to relieve pressure in the line when the pressure reached as much as 45 PSI. The court concluded that on the occasion of the accident this relief valve was also defective and failed to operate.
 
 
 9
 The water heater was equipped with a temperature regulator which was designed to shut off the steam to the coils if the water in the tank exceeded 170~ F. But the court found that at the time of the accident the temperature regulator had been by-passed and was inoperative. The court additionally determined that a pressure relief valve had originally been located on the hot water tank itself but that the relief valve had been removed prior to the accident.
 
 
 10
 The initial rupture of the tank occurred in a weld which held one head of the tank to the tank cylinder. The court ascertained that the weld at the point of rupture had originally received poor penetration, was corroded and had deteriorated to the point where only .020 of an inch of metal still held the tank together. The court also found that this same hot water tank had previously ruptured on three separate occasions.
 
 
 11
 The hot water tank was equipped with a check valve which was located in the line supplying water to the tank. This valve was designed to prevent the flow of hot water back into the cold water source. However, the court concluded that at the time of the accident this valve was also defective and allowed the pressure of the contents of the hot water tank to equalize with the pressure of the fresh water supply to the tank, i. e., the water pressure of the City of Mobile.
 
 
 12
 The shipowner, Cities Service, contends that the initial rupture was caused by a build-up of pressure within the tank resulting from the uninterrupted circulation of the 125 PSI steam through the coils of the heater; and that had steam not been supplied to the vessel in excess of the safe working pressure of her system,[1] there would have been no accident.
 
 
 13
 The shipyard, on the other hand, contends that the pressure within the tank was the same as the shore-based water pressure because of the defective check valve in the cold water line. It contends that the initial rupture was brought about by an increase in the city water pressure as the demand for water throughout the city lessened in the late afternoon.
 
 
 14
 The court said that it was unable to find as a fact whether or not source water (city) pressure caused the initial rupture. The court did find that the defective check valve in the cold water line permitted any pressure which may have built up in the water tank to bleed back or dissipate into the cold water source. The court therefore concluded that the Cities Service had failed to prove that excessive shore-based steam pressure was a proximate cause of the accident.
 
 
 15
 The court did find that the shipyard had supplied shore-based saturated steam at a pressure of 125 PSI to a 70 PSI line of the SS BRADFORD ISLAND.[2] The court also concluded that Cities Service had failed to properly inspect and/or maintain its vessel in the following five respects: (1) failure to inspect and repair the defective steam pressure reducing valve; (2) failure to inspect and repair the defective relief valve in the steam line leading to the hot water heater; (3) failure to inspect the hot water heater's temperature regulator by which they would have discovered that the regulator was bypassed; (4) removal or failure to discover the removal of the pressure relief valve from the hot water heater; (5) failure to inspect and discover the improper and corroded weld on the hot water tank which had ruptured on three prior occasions.
 
 
 16
 The court also concluded that weighing the substantiality of the fault of the shipowner against the shipyard's action in supplying 125 PSI of saturated steam to the vessel's 70 PSI line, the shipowner, Cities Service, was guilty of conduct on its part sufficient to preclude recovery.
 
 
 17
 On appeal Cities Service argues, for the first time in this suit, that the rule of The Pennsylvania, 19 Wall 125, 86 U.S. 125, 22 L.Ed. 148 (1873) should be applied to shift to the shipyard the burden of proving that the excessive steam pressure furnished to the vessel could not have contributed to the cause of the accident. Cities Service contends that the court incorrectly applied a balancing of fault test to determine whether it was guilty of conduct sufficient to preclude indemnity. Additionally Cities Service asserts that certain of the findings of the court are clearly erroneous, inconsistent and incomplete. Upon consideration of the briefs, record and arguments in this case, we find no merit in the contentions of Cities Service and affirm the judgment denying indemnity.
 
 
 18
 The rule of The Pennsylvania was born of a collision between two ships:
 
 
 19
 ". . . [W]hen, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."
 
 
 20
 86 U.S. at 136, 22 L.Ed. at 151.
 
 
 21
 Within the Fifth Circuit, the rule of The Pennsylvania has not been viewed as a rule of liability. The rule creates a shift in the burden of proof as to causation. Green v. Crow, 243 F.2d 401, 403 (5th Cir. 1957).[3] Although Cities Service cites authority in other circuits where the rule has been applied in cases not involving collisions between ships,[4] we have found no instance where this court has done so.
 
 
 22
 The rule of The Pennsylvania was launched in the area of maritime tort and has been applied in suits in which a division of damages was possible.[5] Cities Service asks this court to apply The Pennsylvania's presumption of causation to their contract action for full indemnity for breach of the warranty of workmanlike performance-an area of the maritime law in which division or apportionment of damages has been generally disapproved.[6] We decline to extend the rule of The Pennsylvania from its tort origins to the setting of contractual indemnity for breach of WWLP.[7] While a violation of a safety regulation may be strong evidence of a breach of WWLP, the question of whether such a breach was a proximate cause of the accident remains open and subject to proof.[8]
 
 
 23
 The WWLP consists of the contractual obligation to perform duties under a contract with reasonable safety. Weyerhaeuser SS v. Nacirema Co., 355 U.S. 563, 567, 78 S.Ct. 438, 2 L.Ed.2d 491, 494 (1958). The contracting parties are under reciprocal obligations: the stevedore (or shipyard) to perform its services with reasonable safety; the shipowner to provide a seaworthy vessel and to refrain from hindering performance by the stevedore. Waterman Steamship Corp. v. David, 353 F.2d 660 (5th Cir. 1965), cert. den., 384 U.S. 972, 86 S.Ct. 1863, 16 L.Ed.2d 683 (1966). The determination of whether contractual indemnity should be allowed involves a weighing process evaluating the conduct of both parties to determine: (1) whether the warranty of workmanlike performance was breached; (2) whether that breach proximately caused the injury; and (3) whether the shipowner's conduct prevented the workmanlike performance. David, 353 F.2d 666; Southern Stevedoring & Contracting Co. v. Hellenic Lines, Ltd., 388 F.2d 267, 271-272 (5th Cir. 1968).
 
 
 24
 The absence of negligence on the part of a stevedoring company is not necessarily fatal to a shipowner's claim for contractual indemnity. Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). Conversely, the negligence of a stevedoring company under some circumstances may not require indemnity where the unseaworthiness of the vessel prevents the stevedore's workmanlike performance. David, 353 F.2d at 665. In any case the stevedore's negligence is immaterial unless it is a breach of the contractual warranty of workmanlike performance and is the proximate cause of the longshoreman's injuries. David, 353 F.2d at 664.
 
 
 25
 In this suit Cities Service failed to prove that the shipyard's excessive furnishing of steam pressure was a proximate cause of the initial rupture of the hot water tank. As Cities Service acknowledges, the determination of pressure required to rupture the tank is basically a strength of materials question. Testimony on this question was given by two expert witnesses, Dr. B. F. Barfield for Cities Service and Captain Warren Christie for the shipyard. Because of the many variables in their calculations, involving assumptions as to heat transfer co-efficients, heat loss to the atmosphere, strength of materials, and stress factors, inevitable differences in the expert opinions appeared. The court's findings indicate that he accepted Captain Christie's testimony and concluded that the cold water check valve was defective.[9]
 
 
 26
 Cities Service's theory of causation rests upon the testimony of their expert that a minimum of 86.9 PSI of water pressure was required to rupture the tank and that this water pressure could only have been achieved by steam pressure in excess of 70 PSI. The unstated premise for this theory of causation is that steam pressure in excess of 70 PSI would be supplied to the ship's system where the pressure reducing valve would fail to reduce, the pressure relief valve would fail to release, the water temperature regulator would fail to regulate, and the cold water check valve would permit water pressure to build in a tank which had ruptured on three previous occasions, had been defectively rewelded and from which the water pressure release valve had been removed. Only on this basis could the shipyard's violation of the Labor Department regulations in supplying 125 instead of 70 PSI steam to the vessel be said to have "caused" the accident.
 
 
 27
 The district court simply was unable to accept this theory. It found that the check valve in the fresh water line was defective and that any pressure which may have built up in the tank was dissipated into the cold water source. Thus the court concluded that it was not satisfied that the excess steam pressure was a proximate cause of the accident. The legal consequence of this finding is that Cities Service failed to prove a material element of its cause of action and was therefore not entitled to recover.
 
 
 28
 The findings of the trial court are binding upon this court unless clearly erroneous. Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011, 1020 (5th Cir. 1969). The court's finding that the check valve was defective is based upon a legitimate choice of expert testimony which it was free to accept or reject if it felt the reasons given were unsound. China Union Lines, Ltd. v. A. O. Andersen & Co., 364 F.2d 769, 791 (5th Cir. 1966); Griffin v. Missouri Pacific Railroad Co., 413 F.2d 9, 12-13 (5th Cir. 1969). The court's finding is supported by evidence in the record and is not clearly erroneous. We are not of the opinion that a mistake has been committed.[10] Southern Stevedoring & Contracting Co. v. Hellenic Lines Ltd., 388 F.2d 267, 270 (5th Cir. 1968).
 
 
 29
 We do not feel, as Cities Service contends, that the court was obliged to accept either the theory of causation advanced by Cities Service or the theory advanced by the shipyard. Cities Service argues that where there are only two possible "causes" the court is inconsistent in rejecting one theory without accepting the other. In view of the numerous defects and conditions which attended this accident we do not consider it at all inappropriate or inconsistent for the court to find that he is unable to determine what caused the rupture. Cities Service had the burden of proving, among other things, that the excessive steam furnished by the shipyard was a proximate cause of the rupture. Pacific Far East Line, Inc. v. Jones Stevedoring Co., 346 F.2d 642, 644 (9th Cir. 1965). The court found that Cities Service had failed to meet this burden and that it was not entitled to recover.
 
 
 30
 In view of this dispositive finding, it is unnecessary to discuss the allegations of error in connection with the court's finding that, in addition, Cities Service had failed to prove that its vessel was not guilty of conduct sufficient to preclude indemnity. Considering the record as a whole we do not consider the findings of the court to be clearly erroneous, inconsistent or incomplete. The judgment is therefore affirmed.
 
 
 
 [1]
 Cities Service contends that the safe working pressure was about 35 PSI (or in that vicinity)
 
 
 [2]
 Cities Service points out, and the shipyard concedes, that this supply of excess steam pressure to the vessel, coupled with the shipyard's failure to inquire as to the vesesl's safe working pressure and failure to install a pressure gauge and relief valve, amounted to a violation of the United States Department of Labor Safety Regulations:
 a) Steam supply and hoses. (1) Prior to supplying a vessel with steam from a source outside the vessel, the employer shall ascertain from responsible vessel's representatives, having knowledge of the condition of the plant, the safe working pressure of the vessel's steam system. The employer shall install a pressure gauge and a relief valve of proper size and capacity at the point where the temporary steam hose joins the vessel's steam piping system or systems. The relief valve shall be set and capable of relieving at a pressure not exceeding the safe working pressure of the vessel's system in its present condition, and there shall be no means of isolating the relief valve from the system which it protects. The pressure gauge and relief valve shall be located so as to be visible and readily accessible.
 
 
 [29]
 C.F.R. Sec. 1501.53(a)
 
 
 [3]
 The court has refused to construe the rule to mean that "every vessel guilty of a statutory fault has the burden of establishing that its fault could not, by any stretch of the imagination have had a causal relation to the collision, no matter how speculative, improbable or remote." China Union Lines Ltd. v. A. O. Andersen & Co., 364 F.2d 769, 782 (5th Cir. 1966). See also, Bue, Admiralty Law in the Fifth Circuit, 5 Houston L.Rev. 767, 798f.f. (1968)
 
 
 [4]
 In re Seaboard Shipping Corporation, 449 F.2d 132 (2d Cir. 1971); Afran Transport Co. v. United States, 435 F.2d 213 (2d Cir. 1970); Commercial Transport Corp. v. Martin Oil Service, Inc., 374 F.2d 813 (7th Cir. 1967); The Fort Fetterman v. South Carolina State Highway Dept., 268 F.2d 27 (4th Cir. 1959); The Denali, 105 F.2d 413 (9th Cir. 1939); Marine Sulphur Queen, 312 F.Supp. 1081 (S.D.N.Y.1970); Atlantic Pipe Line Co. v. Dredge Philadelphia, 247 F.Supp. 857 (E.D.Pa.1965), aff'd per curiam, 366 F.2d 780 (3d Cir. 1966)
 
 
 [5]
 See e. g., The Pennsylvania, 86 U.S. at 138, 22 L.Ed. at 152; In re Seaboard Shipping Corp., 449 F.2d 132, 138 (2d Cir. 1971); Commercial Transport Corp. v. Martin Oil Service, Inc., 374 F.2d 813, 819 (7th Cir. 1967); The Fort Fetterman v. South Carolina State Highway Dept., 268 F.2d 27 (4th Cir. 1959); Atlantic Pipe Line Co. v. Dredge Philadelphia, 247 F.Supp. 857 (E.D.Pa.1964) aff'd per curiam, 366 F.2d 780 (3d Cir. 1966)
 
 
 [6]
 Contribution between joint tort feasors in a similar setting was prohibited in Halcyon Lines v. Haenn Ship Ceiling & Refitting Co., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952)
 The result in Halcyon was mitigated by the Court's later adoption in Ryan Stevedoring Co. v. Pan-Atlantic SS Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) of a doctrine which distinguished a suit for breach of an implied contractual warranty of workmanlike performance (WWLP) from a suit for contribution for tort.
 [I]n the area of contractual indemnity an application of the theories of "active" or "passive" as well as "primary" or "secondary" negligence is inappropriate.
 Weyerhaeuser S.S. Co. v. Nacirema Co., 355 U.S. 563 at 569, 78 S.Ct. 438, 442, 2 L.Ed.2d 491 at 495, Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 321, 84 S.Ct. 748, 11 L.Ed.2d 732, 739 (1964).
 Recovery for breach of this contractual warranty generally has been wholly permitted, e. g., Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011, 1040-1041 (5th Cir. 1969); Southern Stevedoring & Contracting Co. v. Hellenic Lines, Ltd., 388 F.2d 267 (5th Cir. 1968); D/S Ove Skou v. Hebert, 365 F.2d 341, 350-351 (5th Cir. 1966); or wholly denied, e. g., Waterman Steamship Corp. v. David, 353 F.2d 660 (5th Cir. 1965). But see, Jones v. S.S. Jesse Lykes, 253 F.Supp. 368 (E.D.Tex.1966); Chevis v. Luckenbach Overseas Corp., 228 F.Supp. 642 (E.D.Tex.1964).
 See generally, Albritton, Division of Damages in Admiralty-A Rising Tide of Confusion, 2 J. of Maritime Law and Commerce, 323, 329 f.f. (1971); Bue, Admiralty Law in the Fifth Circuit, 4 Houston L.Rev. 347, 410 (1966).
 
 
 [7]
 Under Ryan the WWLP is contractual in nature and an action for its breach is not changed from one for breach of contract to one for tort simply because recovery may turn upon the standard of the performance of services. 350 U.S. at 134, 76 S.Ct. 232, 100 L.Ed. at 142
 
 
 [8]
 The facts as found by the district court indicate that application of the rule of The Pennsylvania to the analysis of proximate cause in this case would shed more heat than light. It appears that the defective weld and the removal of the water pressure relief valve would place Cities Service in violation of safety regulations similar to that which it charges the shipyard violated. E. g., 46 C.F.R. Sec. 52.10-25 (1966); 46 C.F.R. Sec. 54.07-1 (1966)
 
 
 [9]
 Captain Christie testified that given the condition of the tank, with the defective weld, if the cold water check valve had not been defective, the hot water heater tank would have ruptured when the water was heated from 140~ to 170~F. A rupture at this temperature would not have produced the explosion which occurred when the tank ruptured at superheated temperatures. There was additional testimony that the water in the tank could have been heated to about 212~F with only 30 PSI of steam if the temperature regulator was not functioning
 
 
 [10]
 Although the court couched its findings in language reflecting Cities Service's failure to meet the burden of proof, we believe the record would support the additional conclusion that shorebased steam pressure did not cause the accident as a matter of fact