Charles P. McCAWLEY, Plaintiff,

v.

OZEANOSUN COMPANIA, MARITIME, S.A., Defendant-Third-Party Plaintiff-Appellee,

v.

GULFWIDE STEVEDORING CORPORATION, Third-Party-Defendant-Appellant.

No. 73–3406.

United States Court of Appeals, Fifth Circuit.

Dec. 9, 1974.

Thomas W. Thorne, Jr., New Orleans, La., for appellant.

J. Dwight LeBlanc, Jr., Robert B. Fisher, Jr., New Orleans, La., for appellee.

Jerome P. Halford, Metairie, La., for McCawley.

Before TUTTLE, WISDOM and GEE, Circuit Judges.

WISDOM, Circuit Judge:

Charles McCawley, a longshoreman employed by Gulfwide Stevedoring Company, fell and injured himself aboard the M/V Bremen on the morning of August 8, 1970 while the vessel was docked at the St. Andrew Street Wharf in New Orleans. McCawley brought suit against Ozeanosun Compania Maritime, the vessel's owner, alleging

that the accident was caused by the unseaworthiness of the ship and the negligence of the shipowner. Ozeanosun, in turn, filed a third-party complaint seeking indemnification from Gulfwide for any sum for which it might be liable to McCawley on the theory that the stevedore's employer breached its warranty of workmanlike performance. This third-party complaint completed the familiar longshoreman-shipowner-stevedore triangle.[1] See Seas Shipping Co., Inc. v. Sieracki, 1946, 328 U.S. 85, 66 S. Ct. 872, 90 L.Ed. 1099 and Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. The 1972 Amendments to the Longshoremen's and Harbor Workers' Act, 33 U.S.C. § 901 et seq., abolished the harbor front workers' right of action based upon the doctrine of unseaworthiness, but those amendments are not applicable to McCawley's accident since it occurred before they were enacted.[2]

■ Before trial in this case, Ozeanosun made an offer of settlement that McCawley accepted. The district court entered judgment in McCawley's favor for $75,000, subject to Gulfwide's preferential lien for compensation benefits it had paid to McCawley in the amount of $5,211.51. Ozeanosun's claim for indemnification was then tried to the court.

The district court, applying the tests set forth in Waterman Steamship Co. v. David, 5 Cir. 1965, 353 F.2d 660 and in Garner v. Cities Service Tankers Corp., 5 Cir. 1972, 456 F.2d 476, found (1) that Gulfwide had breached its warranty of workmanlike performance, (2) that this breach proximately caused the accident, and (3) that the shipowner was not guilty of conduct sufficient to preclude indemnity.[3] The court therefore held that Ozeanosun was entitled to indemnification.

For purposes of this appeal, Gulfwide concedes that the trial court's finding that the stevedore breached its warranty (WWLP) is not clearly erroneous. Gulfwide contends, however, *first* that the trial court failed to make sufficient findings for purposes of review and in fact "apparently adopted" an erroneous standard for measuring "ship conduct sufficient to preclude indemnity and the factors to be considered in determining whether the shipowner was guilty of such conduct". Although the trial court specifically stated that it applied the *Waterman* test to the facts, Gulfwide argues that the court would have found conduct sufficient to preclude indemnity only if the shipowner had physically restrained or attempted to restrain the stevedores from leaving the hazardous area. *Second,* Gulfwide argues that the

---

1. For an account of the development of the *Sieracki* seaman admiralty triangle, see G. Gilmore and C. Black, Law of Admiralty 358–374 (1957) and 1A Benedict, On Admiralty § 119 (7th ed. 1973).

2. The 1972 Amendments to the Longshoremen's and Harbor Workers' Act were enacted to simplify the relationship of longshoremen, their employers and shipowners as it had developed in the aftermath of *Sieracki* and *Ryan.* By improving compensation benefits, Congress hoped to remove the unseaworthiness fiction from the determination of these personal injury cases. The House Committee Report on the Amendments states that the "Committee has noted that the seaworthiness concept was developed by the courts to protect seamen from the extreme hazards incident to their employment which frequently requires long sea voyages and duties of obedience to orders not gener-

ally required of other workers. The rationale which justifies holding the vessel absolutely liable to seamen if the vessel is unseaworthy does not apply with equal force to longshoremen and other non-seamen working on board a vessel while it is in port." 1972 U.S.Code, Cong. & Admin.News pp. 4698, 4703 (92nd Cong., 2d Sess.). See Julian v. Mitsui O.S.K. Lines, Ltd., 5 Cir. 1973, 479 F.2d 432, 434.

3. "The determination of whether contractual indemnity should be allowed involves a weighing process evaluating the conduct of both parties to determine: (1) whether the warranty of workman-like performance was breached; (2) whether that breach proximately caused the injury; and (3) whether the shipowner's conduct prevented the workman-like performance." Garner v. Cities Service Tankers Corp., 5th Cir. 1972, 456 F.2d 476, 481.

trial court's award of attorney's fees and costs should be reversed.

These arguments have no merit. We affirm.

## I

In July 1970, the M/V Bremen transported a cargo of raw sugar from the Fiji Islands to the Port of New York. This cargo filled all five hatches and was discharged in New York during a four-day period by means of shore-based cranes with grab-buckets. A considerable amount of raw sugar fell on the main deck of the vessel. The New York stevedore attempted to remove the raw sugar from the deck, but this effort was unsuccessful.

The M/V Bremen arrived in New Orleans in the afternoon of August 7, 1970. On three occasions during the voyage from New York, the ship's crew attempted unsuccessfully to remove the sugar residue from the deck. The crew washed the deck twice at sea and once on the Mississippi River. The effect of adding river water to the raw sugar was to reduce the raw sugar to a clear slippery substance.

The object of the M/V Bremen's trip to New Orleans was to receive a cargo of soya beans and soya meal. Before a cargo of soya beans could be taken aboard, it was necessary that grain fittings be constructed in the hatches. The M/V Bremen's time charterer engaged Gulfwide to construct these fittings.

The M/V Bremen docked at the St. Andrew Street Wharf in New Orleans at 4 o'clock in the afternoon of August 7. Between 4 and 5 o'clock that afternoon, two of Gulfwide's employees came aboard the ship and measured the hatches for grain fittings. Work was scheduled to begin on the project at 8 o'clock the next morning.

Members of the longshore/carpenter gang began to board the ship between 7:30 and 7:40 to take a morning smoke, because smoking was not permitted on the wharf. Several members of the gang testified that they noticed the sugar residue on the deck as early as 7:45. McCawley himself testified that he went on board between 7:30 and 8:00 and that he saw and smelled the sugar at that time. The accident did not occur, according to McCawley's testimony, until between 8:30 and 8:45.

At the time of the accident, Gulfwide's supervisory personnel at the scene had ordered the longshoremen aboard the vessel to stop work and stand by for further orders. Jacob Manguno, Gulfwide's superintendent on the morning of August 8, testified that he first learned of the deck's condition at about 8:10. Manguno did not board the ship to investigate the extent of the sugar on the deck, but relayed an order for the men to "stand by". Although one of the reasons for the standby order was the slippery condition of the deck, Gulfwide's supervising personnel neither warned the men of the dangerous condition nor attempted to remove them to safer quarters. In effect, Manguno's order allowed the men to mill about on the slippery deck.

Manguno then telephoned his superior, John Bryant, with regard to a lack of construction materials at the site. In the course of the conversation, Manguno mentioned the condition of the deck to Bryant, who told him to get the men off the ship. Manguno testified that he was principally concerned with the lack of materials and he characterized his concern for the slippery deck as secondary. This is not surprising, since Manguno had not gone aboard to inspect the deck when its condition was called to his attention.

Between 8:30 and 8:45, McCawley, feeling the urge for a sandwich out of his lunch bag, walked along the slippery deck. He fell, suffering the injuries for which he received judgment below.

## II

Gulfwide asserts that the trial court "apparently adopted" an erroneous standard in determining whether the shipowner's conduct was sufficient to prevent the stevedore's workmanlike per-

formance and preclude indemnity. The stevedore argues [4] that the trial court refused to consider anything short of actual restraint by the shipowner as conduct to preclude indemnity.

We find no evidence in the transcript or in the opinion of the court below to support the stevedore's argument. Although the application of a standard that fails to consider anything short of physical restraint as conduct to preclude indemnity would be clearly erroneous in light of the case law in this circuit, we find no indication in the record that such a standard had any place in the trial court's determination. The trial court in terms stated that it applied the *Waterman-Garner* standard. Moreover, the trial court's analysis is consistent with the overriding principle that liability should be fixed on "the party best situated to adopt preventive measures and thereby reduce the likelihood of injury". Italia Societa per Azione di Navigazione v. Oregon Stevedoring Co., 1964, 376 U.S. 315 at 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732.

Gulfwide argues that Ozeanosun was guilty of conduct sufficient to preclude indemnity because the condition of the deck was such that the shipowner did not provide the stevedore with a ship (a safe place) where the stevedore could, in the exercise of reasonable care, perform its contract in a workmanlike manner. This argument leads us in a circle. Although the appellant concedes that the trial court's finding that it breached its warranty of workmanlike performance is not clearly erroneous, we are asked at the same time to find that the ship's condition would preclude in its entirety the stevedore's performance of its contract and thus absolve it of any liability.

Gulfwide's attempt to circumvent the findings of the trial court is ingenious but it has little relation to the facts of this case. Gulfwide focuses our attention on the genesis of the ship's unseaworthy condition rather than on the more relevant issue of whose conduct it was that "brought into play" the ship's unseaworthiness so as to cause the accident. See Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

The history of the deck's condition, as well as the crew's knowledge of that condition implicit in its multiple attempts to remove the sugar residue, would be relevant if it were not for the fact that Gulfwide had actual notice of the danger and ample opportunity to prevent the accident before it happened. Whatever the state of Gulfwide's knowledge at the time of the initial inspection on August 7 or at the time of the boarding of the vessel by the first stevedores on August 8, the danger was a known danger at the time of the accident because it was reported to Joseph Manguno, Gulfwide's supervisor, at least 25 minutes before the accident occurred.

Because members of the longshore gang obey orders only if given through the Gulfwide chain of command and would not, under any circumstances, obey orders given by the ship's officers or crew, only Joseph Manguno or one of his deputies could have prevented the accident by issuing appropriate orders telling the men of the danger and advising them how to avoid possible harm. Instead of issuing such orders, Manguno chose not to board the ship to investigate the extent of the danger, but simply ordered the men to stand by.

---

4. The appellant also argues that the trial court made insufficient findings of fact. The trial court's opinion, read in conjunction with the record of the proceedings below, convinces us that the trial court applied the proper legal principles on the basis of relevant facts. Under Rule 52(a) of the Federal Rules of Civil Procedure, it is not necessary for the trial court to state specially its findings of fact and conclusions of law if

there is a written opinion and the facts and applicable law are stated therein: "[i]f an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein". The purpose of this rule is to facilitate appellate review and it must not be applied so as to prohibit review by the Court of Appeals where there is a sufficient basis for the court to consider the merits of the case.

Depite the facts of the case, Gulfwide argues that Manguno's omissions do not amount to a breach of its warranty of workmanlike performance because the shipowner's conduct was sufficient to preclude performance of the stevedore's contract in its entirety. While it may be true that Ozeanosun's conduct was such that the sugar spill precluded Gulfwide from performing the task that it had contracted to perform in constructing grain fixtures in the holds of the M/V Bremen, it is not true that the ship's conduct precluded the stevedoring company from living up to its warranty of workmanlike performance with regard to the acts which it did perform toward the fulfillment of its obligations under the contract.

The stevedore's warranty of workmanlike performance is not confined to the proper performance of the principal object of the contract, but encompasses all duties which are by nature ancillary to that principal object. As this Court has said, "[t]he WWLP consists of the contractual obligation to perform duties under a contract with reasonable safety". Garner v. Cities Service Tankers Corp., 5 Cir. 1972, 456 F.2d 476, 481. See also Parfait v. Jahncke Service, Inc., 5 Cir. 1973, 484 F.2d 296, 301–302. The stevedore's obligations under its warranty amount to a "series of contractual duties". Olin Mathieson Chemical Corp. v. United Stevedores Div., S.D.Tex.1969, 317 F.Supp. 1373.

Although the principal duty under Gulfwide's contract was to construct grain fixtures, the ancillary duties of preparing to construct the fixtures and of supervising the longshoreman/carpenters from the time they came aboard ship must also be considered "duties under the contract". The mere fact that the principal purpose of the contract was later frustrated because of the slippery deck will not absolve the stevedoring company of its breach of warranty of workmanlike performance with respect to the duties which ought to have been performed before that point. Indeed, it is apparent from the record that neither the shipowner nor the stevedore considered the contract to be frustrated at the time of the accident.

In the face of Joseph Manguno's testimony that he was principally concerned with the lack of materials at the site and would have permitted his men to board the vessel even if he had been fully aware of the deck's condition before their actual boarding of the ship, we cannot find that the faulty condition of the deck suspended the ancillary duties owed by the stevedoring company to the shipowner under the warranty of workmanlike performance.

A comparison of the facts in this case with those in Olin Mathieson Chemical Corp. v. United Stevedoring Division, S. D.Tex.1969, 317 F.Supp. 1373, affirmed per curiam 432 F.2d 1234, demonstrates the fallacy inherent in Gulfwide's position. In *Olin Mathieson*, a longshoreman slipped on the engineroom floor while attempting to start the vessel's engines. The longshoreman saw a film of oil on the engineroom floor and had previously complained of this same condition on other ships owned by the defendant. Nevertheless, he went ahead and attempted to start the engines. The trial court said:

> There is no issue as to the manner in which he performed this job; the question is whether his decision to continue working under these circumstances constituted a breach of his warranty of workmanlike service since it "brought into play" the vessel's unseaworthy condition. 317 F.Supp. 1373, 1376.

Gulfwide takes comfort from the Court's emphasis in *Olin Mathieson* on the longshoreman's "decision to keep working" as the root of liability there. By negative implication, it would have us hold that Gulfwide's decision not to continue work in the present case just as clearly absolves it from liability. Such a per se rule would be illogical from the viewpoint of fixing liability on the party best able to prevent the accident.

Although the accident in *Olin Mathieson* might have been prevented by the longshoreman's stopping work, the

mere standby order in the present case was clearly inadequate to prevent the accident because the danger here consisted not of the longshoremen's *working* on the slippery deck, but of their *being* on the slippery deck. Unless we are willing to attach some metaphysical significance to the standby order so that it will absolve the stevedore of liability in every case, regardless of the relative abilities of the shipowner and stevedore to prevent the accident, we must find that the standby order in this case was insufficient in light of the facts to shift liability back to the shipowner.

Reduced to its simplest form, Gulfwide's argument is that "the shipowner [and] not the stevedore was in the best position to minimize the risk of injury". We cannot say that the trial court's finding to the contrary is clearly erroneous and we decline to reverse its judgment on that basis. Our reading of the *Olin Mathieson* case demonstrates that the genesis of the hazard is of only secondary importance. The relevant question is not who created the danger but who had the immediate opportunity to prevent the accident. The trial court found that Gulfwide had that opportunity and we do not find that determination to be clearly erroneous.

### III

In this circuit foreseeable damages recoverable for breach of warranty of workmanlike performance include reasonable attorney's fees and litigation expenses. Strachan Shipping Co. v. Koninklyke Nederlandsche, 5 Cir. 1963, 324 F.2d 746. See also C. Bue, Admiralty Law In The Fifth Circuit: A Compendium for Practitioners, 4 Houston L. Rev. 347, 419–420 (1966). Gulfwide does not dispute the reasonableness of the lower court's award for attorney's fees but simply asks us to change the rule of the circuit. We decline to do so.

For the reasons stated above, the judgment of the trial court is affirmed.