**NATIONAL MARINE SERVICE, INC., Plaintiff,**

v.

**GULF OIL COMPANY et al., Defendants.**

**Civ. A. No. 76–1309.**

United States District Court, E. D. Louisiana.

May 27, 1977.

Edward S. Bagley, New Orleans, La., for National Marine Service, Inc.

Felicien P. Lozes, H. Edward Weidlich, Jr., New Orleans, La., for Gulf Oil Co.

Edith Brown Clement, John R. Peters, Jr., New Orleans, La., for Hess Pipeline Co.

ALVIN B. RUBIN, District Judge:

National Marine Service, Inc. (National) seeks indemnity or contribution from Gulf Oil Company (Gulf) and Hess Pipeline Company (Hess) for $70,000 paid to Jack Allen Cross (Cross), a Jones Act employee of National Marine, in settlement of Cross' claim for personal injuries. National's claim against Gulf is predicated on a contract between them; paragraph 14 of their agreement states that Gulf will provide "free and safe wharfage and cargoes shall be loaded and discharged by day and by night in any dock or place shipper may direct within the limits of this agreement, where the vessel can always lie safely afloat." National also asserts a tort indemnity claim against Gulf; its claim against Hess is for indemnity or contribution founded on principles of tort. Hess, in turn, seeks indemnity or contribution from National for $15,000 paid to Cross in settlement of Cross' claim.

I.

Cross was a member of the crew of National's vessel, the M/V National Ideal. National had a contract to transport crude oil for Gulf. The master of the vessel was directed by Gulf to take on cargo at Hess' terminal in Mobile, Alabama. Hess operates both a barge dock and a ship dock for the loading of vessels. The M/V National Ideal had a tow of three barges, and the Hess barge dock will not accommodate such a tow intact. National could use the barge dock only by breaking its tow, and, on past trips, National's masters had preferred to use the ship terminal instead of the barge terminal in order to keep their tow intact and avoid the extra time and work involved in separating the barges. Therefore, as the National flotilla approached Mobile, National's operator, Captain Kiell, radioed the Hess operator, who instructed him to dock at the ship dock. This was for National's convenience and satisfied no need or requirement of either Hess or Gulf. Captain Kiell did not object to this, although he knew or should have known that no access facilities for personnel were provided at the ship dock.

The ship dock was so constructed that there were dolphins between the dock and any ship that was moored at it. Therefore a tow would not be flush with the dock, and personnel would not be able to step across between dock and barge. In addition, when the flotilla came in "empty" or "light", the barges rode high out of the water. As they were loaded, their freeboard was gradually reduced. Hence, initially the barges were several feet above the level of the dock. As the barges were loaded, their deck level approached the dock level, then came even with it, then went below the dock level.

The master knew that the ship dock had no gangway, and the National Ideal carried a 10 or 12 foot straight ladder to be used by personnel in moving between dock and vessel. When the vessel arrived, the ladder was used at an acute angle from dock to barge and was ascended or descended in the fashion normal for the use of such ladders. There was the same situation when the vessel took on most of its load, except that, of course then, the ladder rose from barge to dock. But during a part of the time, when the barge deck and the dock were level, or almost so, the ladder was horizontal, or almost so. Since the ladder had only rungs and side pieces, and lacked both hand rails and a single continuous bottom, it could safely be used for personnel passage only if the user grasped the side rails and went across in a squatting or a crawling position.

National's master knew this, and, indeed, had complained to Hess personnel about the fact that there was no gangway at the dock. Nothing was done about the access problem at the ship dock because, when this dock was used by ships, they had their own gangways. The barge dock did not present this problem because barges could moor directly alongside it.

When the barges arrived at Hess' ship dock on February 25th, they were light and approximately ten feet out of the water. Thus, when loading commenced, the ladder from the access dolphin to the deck of the barges formed an angle in excess of 45 degrees. This angle gradually decreased as the barges were loaded.

Late that afternoon, Cross came aboard the National Ideal with his uncle. During the evening hours, he and his uncle consumed a quantity of whiskey with the captain's knowledge and permission. Cross went on watch at midnight, February 25th, and apparently stopped drinking then.

Early in the morning on February 26th, Cross was walking erect on the ladder from a moored barge to the dolphin adjacent to the dock, fell, and was injured. He was neither crouching down nor using his hands to hold onto the railing of the ladder, in part because he was carrying coffee and groceries from the tug with the intention of putting them in his parked car, thereby converting the tug's supplies to his own use. At the time, he was wearing leather soled cowboy boots. The ladder was approximately horizontal. It was not tied on either end, and Cross had not asked a crew member to assist him. The M/V National Ideal had a skiff, which could have been used for access between barge and dock, but it was quicker for its personnel to use the ladder, and they customarily did so, with the master's sanction.

Cross' injuries were serious and permanent. They impaired his earning power substantially. While he was doubtless contributorily negligent, his Jones Act and unseaworthiness claims against the vessel would, in my opinion, have resulted in a judgment against National in a substantial amount.

## II.

National never tendered defense or control of the litigation to Gulf or Hess; it did not tender the settlement agreed upon to Gulf or Hess, or consult them in any way with respect to the settlement with Cross.

■ National's failure to tender or consult does not preclude its indemnity claim if it can show that it was, in fact, liable to Cross, that the settlement was reasonable, and that neither third-party defendant was prejudiced by its failure to inform them of the negotiations or to tender them the defense. *Wisconsin Barge Line, Inc. v. Barge Chem 300*, 5th Cir. 1977, 546 F.2d 1125 and *Whisenant v. Brewster-Bartle Offshore Co.*, 5th Cir. 1971, 446 F.2d 394. See also *Tankrederiet Gefion A/S v. Hyman-Michaels Co.*, 6th Cir. 1969, 406 F.2d 1039. Based on the evidence introduced in this case, I find that National would have been cast in judgment and that the amount it paid to settle the claim against it was reasonable. However, even if National's failure to tender does not bar its indemnity claim, it must still prove a theory of relief entitling it to indemnity.

Cross had a separate suit against Hess, in which a jury trial had been demanded. Hess also failed to tender the defense or control of its litigation or tender the settlement agreed upon. Hess paid $15,000 in settlement of this claim. The evidence indicates to me that Hess would not have been cast, although, considering the cost of defense, and Hess' potential exposure to a large verdict in a jury trial of a claim by an injured person against an oil company, the amount paid was a reasonable settlement.

National now seeks to recover the full amount it paid, from Gulf and Hess, either through indemnity or contribution, while Hess cross-claims for the $15,000 it paid.

### III.   Indemnity Claim Against Gulf

#### A.   Contract

■ In both pre-trial and post-trial briefs, National has served up a stew of

argument without analyzing separately the various bases for its claims. This made it difficult for the court to comprehend its arguments. In an effort to find a coherent basis to deal with the issues presented, it is necessary to restructure them.

One asserted basis for recovery against Gulf is its breach of contract. But it is the express contract that must support this claim. National asserts as authorities instead cases concerning the indemnity due a shipowner by a stevedore arising out of the stevedore's implied warranty of workmanlike compensation (WWLP). The warranty was established by the decision in *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. The cases cited all involve *Ryan* situations. See *Waterman Steamship Corp. v. David*, 5th Cir. 1965, 353 F.2d 660; *Parfait v. Jahncke Service, Inc.*, 5th Cir. 1973, 484 F.2d 296; *LeBlanc v. Two-R. Drilling Co.*, 5th Cir. 1976, 527 F.2d 1316.

But Gulf made no *Ryan* warranty. Chief Judge John R. Brown's resume in *LeBlanc v. Two-R. Drilling Co.*, 5th Cir. 1976, 527 F.2d 1316, 1319, puts the issue in perspective:

> Under the old regime of law, which is applicable in this case, a shipowner had a duty to Sieracki seamen to furnish a seaworthy ship and he was strictly liable for injury resulting from an unseaworthy condition. See *Sea Shipping Company v. Sieracki, supra* [328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099]; *Mitchell v. Trawler Racer*, 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 41, 1960 AMC 1503. All parties in this case agree that the muddy landing and stairway constituted an unseaworthy condition but the inquiry does not stop here, for in *Ryan*, supra, the Supreme Court held that a shipowner may be entitled to indemnity from the stevedore company for breach of the WWLP. See also 1A Benedict on Admiralty § 119 at 6–27 et seq. (6th ed. 1974).
>
> This indemnity action, which has its origin in contract, in essence requires the stevedore company to perform its work 'properly and safely' and the Court em-

phasized that 'competence and safety are inescapable elements of the stevedore's undertaking'. 350 U.S. 124, 133, 76 S.Ct. 232, 237, 100 L.Ed. 133, 142, 1956 AMC 9, 17. Our Court has phrased this duty as 'the contractual obligation to perform duties under a contract with reasonable safety'. *Garner v. Cities Service Tankers Corp.*, 5 Cir., 1972, 456 F.2d 476, 481, 1972 AMC 1980, 1987; accord *Parfait v. Jahncke Service, Inc.*, 5 Cir., 1973, 484 F.2d 296, 301–02, 1973 AMC 2447, 2452; *Brock v. Coral Drilling, Inc.*, 5 Cir., 1973, 477 F.2d 211, 215, 1973 AMC 1117, 1121.

The WWLP cases are irrelevant, for Gulf was performing no services for National. It owed National no WWLP. Compare *Parfait v. Jahncke Service, Inc.*, 5th Cir. 1973, 484 F.2d 296, dealing with a diesel repairman. Hence, it is immaterial whether Gulf's conduct would have made it liable to National had Gulf been a stevedore on National's vessel.

When the contract itself is examined, it becomes clear that Gulf's contractual obligation to National was to provide a safe berth for its vessel; neither expressly nor by implication was it bound to provide means of ingress and egress for the vessel's employees. In terms, the contract refers to providing a safe wharfage where the vessel may lie safely afloat. Nothing is said about providing safe facilities for personnel. Traditionally, such "safe berth clauses" were included for the protection of the owner of the vessel, so that his master could refuse to go into an unsafe berth without violating the contract. See Gilmore and Black, The Law of Admiralty (2d Ed.), page 204:

> It is quite inconsonant with the positions of the parties, in the usual case, to charge the charterer [here Gulf] with the consequence of the master's [National Marine's] having entered an unsafe port or tied up at an unsafe berth. It is the master who ordinarily has the best means of judging the safety of a port or berth, first because he is an expert in navigation, furnished with aids thereto, secondly because he knows his vessel (including its draft and its present trim), and thirdly

because he is on the spot. The charterer, on the other hand, need not be a nautical expert at all, knows nothing about the vessel except its capacity, and normally is far from the scene of decision as to safety; his designation of port and berth are made (and are known to be made) on commercial rather than on nautical grounds.

Further, the master, by the very words of the usual clauses, is not obligated to take his vessel to any unsafe port or berth. The very purpose of the clauses is to free him of this obligation. Since these clauses can be and have been given this meaning, it is by no means necessary that they be given the quite different meaning of creating an affirmative liability of charterer to ship, in case of mishap.

This would be all the more true where the berth was safe, the vessel did indeed lie safely afloat, and its deckhand was injured while on what, euphemistically described, was a personal errand.

The contract between National and Gulf did not provide expressly for indemnity by Gulf for National's negligence. National was itself actively negligent and, absent express grounds for indemnity under those circumstances, it cannot obtain indemnity from Gulf. *Batson-Cook Company v. Industrial Steel Erectors*, 5th Cir. 1958, 257 F.2d 410.

## B. Tort Claims Against Gulf

National also seeks tort indemnity from Gulf, but it is difficult to perceive on what factual, let alone legal, basis. Gulf did not operate the wharf, nor did Hess operate it for Gulf's account. National's brief does not state what tort Gulf committed. Even if Gulf were a tort-feasor, National's negligence was active, so there could be no indemnity on the basis that it was a passive party, condemned in tort as a result of Gulf's active negligence. *Thibodeaux v. Texas Eastern Transmission Corp.*, 5th Cir. 1977, 548 F.2d 581; *Horton & Horton v. T/S J. E. Dyer*, 5th Cir. 1970, 428 F.2d 1131. Indeed, Cross himself was contributorily negligent, and that is the reason that he

acceded to the settlement. Cross' negligence is imputed to his employer when it seeks indemnity for sums paid him.

Contribution from Gulf as a joint tort-feasor does not appear to be demanded. If it were, however, no factual basis for the claim appears, for no tort by Gulf has been shown.

## IV. Claims Against Hess

### A. Implied Indemnity

■ Hess had no contract with National. Its only contractual obligation arose from its contract with Gulf to provide wharfinger services to National. The wharfinger does owe vessels that dock at its wharves an implied warranty of workmanlike performance. *Sims v. Chesapeake and Ohio Railway Company*, 6th Cir. 1975, 520 F.2d 556, 561. The court there said:

The nature of the services performed by the wharfinger determines the extent of this warranty. . . . The implied warranties of a wharfinger relate to the conditions of berths and the removal of dangerous obstructions or giving notice of their existence to vessels about to use the berths. . . . A wharfinger also owes a duty to furnish a safe means of egress and ingress to berthed ships.

However, this statement must be read in the context of the facts. There the injury occurred when a crew member stepped into a hole on the wharf. Similarly, in *Bailey v. Texas Co.*, 2d Cir. 1931, 47 F.2d 153, the court held that a crew member was an invitee while on the wharf, and the wharfinger was liable for negligence to a seaman who stumbled on a pipe on the wharf while returning to the vessel.

■ Here the injury occurred on the ladder furnished by the ship. The duty to provide safe ingress to the ship is not a warranty of services that are provided by the vessel instead of the wharf. The evidence fails to show any defect in the dock; the claimed fault lies in Hess' failure to provide a gangway or some safer means of access than the vessel itself supplied.

The words of the opinion in *Daniels v. Florida Power & Light Company, Inc.*, 5th Cir. 1963, 317 F.2d 41, 42–43, are so apposite here that they fit the case with but a change in names:

> There was nothing inherently dangerous about the ladder. It was not put in use by [Hess]. There was no duty on [Hess] to supply a ladder in the first place. Even if it be argued that customary use with knowledge of [Hess] imposed some duty, our attention is not called to any theory whereunder a duty was imposed on [Hess] under these facts to supply a ladder that would not slip or one with handrails on it. Furthermore, appellants had used the ladder many times before, and even on the night of the accident; and such risk or danger, if any, as attached to the use of the ladder was so reasonably apparent as to be a bar under the circumstances . . .

In *Daniels*, unlike the present case, the ladder was, in fact, supplied by the wharfinger; here it was provided by the vessel itself.

### B. OSHA Regulations

National contends that the times, they have changed, and, that, whatever *Daniels* may have held, the OSHA regulations, adopted pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C.A. § 651, et seq., particularly 29 CFR § 1918.-23, impose a duty on wharfingers to provide safe access to their wharves.

■ However the OSHA regulations do not apply to vessels or vessel personnel. In *Brown v. Mitsubishi Shintaku Ginko*, 5th Cir. 1977, 550 F.2d 331, 333, Judge Wisdom, writing for the court, pointed out:

> As 29 C.F.R. § 1918.2(b) states, and as we emphasized in *Gay v. Ocean Transport & Trading Co.*, 5 Cir. 1977, 546 F.2d 1233 (No. 75–2729), the Longshoring Safety and Health Regulations apply only to employers; they do not automatically impose a duty 'on owners, operators, agents or masters of vessels unless such persons are acting as employers'. *Gay v. Ocean Transport & Trading Co.*, 5 Cir. 1977, at 1239 n. 9.

Here, Hess was not the employer of Cross. The regulations do not automatically impose a duty on wharfingers with respect to their business visitors unless the wharfinger is acting as an employer. It is the shipowner who owes the duty of providing reasonably safe means of access to its vessel. *Arthur v. Flota Mercante Gran Centro Americana S. A.*, 5th Cir. 1973, 487 F.2d 561.

The OSHA regulations in terms apply only to longshoremen and not to crews of vessels, Jones Act seamen. Section 1910.-5(b) provides as follows:

> None of the standards in this part shall apply to working conditions of employees with respect to which federal agencies other than the Department of Labor, or state agencies . . . exercise statutory authority to prescribe or enforce standards or regulations effecting occupational safety or health.

■ The Occupational Safety & Health Review Commission has consistently recognized that the Coast Guard retains authority, to the exclusion of OSHA, to regulate the safe working conditions of "seamen", as distinguished from "longshoremen". See Prudential Lines, 1975, OSHRC Docket No. 10820, 3 BNA OSHC 1532; T. Smith & Son, 1974, OSHRC Docket No. 2240, 2 BNA OSHC 1177. See also, Transamerican Trailer Transport, 1974, OSHRC Docket No. 4786, 2 BNA, OSHC 3007; California Stevedoring & Ballast Company, 1974, OSHRC Docket No. 1132, 1 BNA OSHC 1757. Hence, there was no violation of the OSHA standard § 1918.23, since the standard does not create a duty on the part of Hess to a Jones Act seaman, such as Cross. Nor does it create a duty on the part of Hess to a non-employee. If there was no duty, there could be no violation, no negligence per se.

■ Even if there was a violation of the OSHA regulations, that violation may not be used to create civil liability, 29 U.S.C.A. § 653(b)(4), although the regulations may be referred to as guides for the determination of standards of care, *Buhler v. Marriott*

*Hotels, Inc.,* D.C.La.1974, 390 F.Supp. 999. See the Occupational Safety and Health Act of 1970 and the Law of Torts, 1974, 38 Law and Contemporary Problems 612.

The rights and duties created by OSHA regulations differ, of course, from those created by Coast Guard Regulations. See *Alaska Steamship Company, Inc. v. Petterson,* 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; *Crumady v. J. H. Fisser,* 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. See also *Price v. SS Yaracuy,* 5th Cir. 1967, 378 F.2d 156, holding that a stevedore's breach of the regulations can make the shipowner negligent. Compare Robertson, Negligence Actions by Longshoremen against Shipowners under the 1972 Amendments to the LHWCA, 1976, 7 Journal of Maritime Law and Commerce 447. In this respect, one cannot merely say in the fashion of Gertrude Stein, "A regulation is a regulation is a regulation." *Grigsby v. Coastal Marine Service of Texas, Inc.,* 5th Cir. 1969, 412 F.2d 1011, decided before OSHA was enacted, did hold a violation of LHWCA regulations to be negligence. But this was because the regulation, adopted pursuant to another statute, 33 U.S.C.A. § 941, imposed standards for working conditions pursuant to a statutory mandate that lacked the inhibition against creating civil liability found in OSHA, 29 U.S.C. § 653(b)(4).

National's reliance upon *Arthur v. Flota Mercante Gran Centro Americana S. A., supra,* is misplaced. It is true that in *Arthur,* the Fifth Circuit held a *vessel owner* liable to a business invitee for violation of the Safety and Health Regulations. It then relied upon the decision in *Marshall v. Isthmian Lines,* 5th Cir. 1964, 334 F.2d 131, which involved the violation of a *Coast Guard* regulation. The Fifth Circuit has in effect overruled its decision in *Arthur* by its later decisions in *Gay v. Ocean Transport & Trading Co.,* 5th Cir. 1977, 546 F.2d 1233, and *Brown v. Mitsubishi Shintaku Ginko,* 5th Cir. 1977, 550 F.2d 331, already referred to; these deal with OSHA regulations and, as we have seen, the violation of OSHA regulations does not create civil liability per se.

## C. National's Negligence Bars Recovery

■ It is needless to consider whether the contributory negligence of Cross alone would bar recovery. See *Lusich v. Bloomfield,* 5th Cir. 1966, 355 F.2d 770. The very basis of National's claim, that it would have been liable, as discussed at the start of this opinion, presupposes that there was negligence on the part of its master. This negligence is clearly imputable to National.

## D. Contribution

■ In order to secure contribution from Hess, National must establish that Hess and National were joint tort-feasors with respect to Cross. As set forth above, this evidence is insufficient to establish that Hess breached any duty owed to Cross as to render Hess liable to him as a joint tort-feasor.

Hess owed no duty to Cross under the OSHA Safety and Health Standards because Cross was not Hess' "employee" and because Cross was a "member of the crew". Hess owed Cross no implied warranty. At most, it owed him a duty of ordinary care. *Kermarec v. Compagnie Generale Transatlantique,* 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550. Compare *Vegh v. Kaiser Aluminum & Chemical Corp.,* La.App. 1st Cir., 1972, 259 So.2d 580; *Rachal v. Brookshire Grocery Stores, Inc.,* La.App. 3d Cir., 1976, 336 So.2d 1014. See also *Bailey v. Texas Co.,* 2d Cir. 1931, 47 F.2d 153.

Both National and Cross were aware that Hess provided no gangway or ladder. The risk was open and obvious. National undertook to furnish the ladder. National has no right of contribution from Hess both because Hess breached no duty owed to Cross, and because, in any event, the injury was caused by the fault of National.

## V. Hess' Claim Against National

■ Hess in turn seeks to recover the $15,000 it paid Cross. As it contends, and as already noted, Hess was not negligent with respect to Cross. It would not have been cast in judgment. It paid a modest amount to him to avoid the expense of and

the risks implicit in a jury trial. National had not agreed to indemnify Hess, and there was no implied indemnity due, for reasons already set forth, so there is no contractual basis for the claim. Tort indemnity cannot be allowed on the active-passive thesis, for Hess was not negligent at all. Neither is contribution due, for Hess was not a joint tort-feasor.

Perhaps, because National had settled at the time when Hess sought to do so, it was not necessary for Hess to tender its claim to National as a requisite to a later indemnity action. But if the obligation to tender does exist under such circumstances, indemnity would be precluded under *Whisenant* and *Wisconsin Barge* for Hess was not, in fact, liable to Cross, as required of parties, like Hess, who fail to tender defense of the claim for which they seek indemnity. However, as the facts would not support an indemnity action in any event, the issue need not be resolved.

### VI.

Accordingly, judgment will be entered against National Marine Service, Inc. in its claims against Gulf Oil Company and Hess Pipeline Company, and against Hess Pipeline Company in its claims against National Marine Service, Inc.